# EXHIBIT 1

## FRANCHISE AGREEMENT

THIS AGREEMENT is made and entered into this 19th day of May, 2011, by and between CLEANNET OF ILLINOIS, INC., an Illinois corporation ("Franchisor") and Ricardo Cruz, Jose F. Sanchez ("Franchisee"), doing business as a:

(     )     Corporation
(     )     Limited Liability Company
( X )     Partnership, or
(     )     Sole Proprietorship

WHEREAS, Franchisor, as the result of significant expenditures of time, skill, effort and money, has developed and owns a system ("System") relating to the establishment, development and operation of a CleanNet commercial cleaning business specializing in janitorial services, building maintenance, and related services ("Franchised Business");

WHEREAS, the distinguishing characteristics of the System include, without limitation, unique methods, technical assistance and training in the operation, management and promotion of the Franchised Business; specifications for cleaning equipment and supplies; specialized commercial cleaning services, methods of operations control; centralized billing and collections services, bookkeeping and accounting methods; and marketing and promotional programs, all of which may be periodically changed, improved and further developed by Franchisor;

WHEREAS, the System is identified by means of certain trade names, service marks, trade marks, logos, emblems and indicia of origin, including but not limited to the service mark CleanNet and logo, and such other trade names, service marks, and trademarks as are now, and may hereafter be designated by Franchisor for use in connection with the System ("Proprietary Marks") which Proprietary Marks are owned by Franchisor which has the exclusive right and license to sublicense and police the use of such Proprietary Marks;

WHEREAS, Franchisor continues to develop, expand, use, control and add to the Proprietary Marks and System for the benefit and exclusive use of itself and its franchisees in order to identify for the public the source of the services marketed thereunder and to represent the System's high standards of quality and service;

WHEREAS, Franchisee desires to operate a Franchised Business under the System and the Proprietary Marks and obtain a license from Franchisor for that purpose, as well as to receive the training and other assistance provided by Franchisor in connection therewith; and

WHEREAS, Franchisee hereby acknowledges that it has read this Agreement and Franchisor's disclosure document, and that it has no knowledge of any representations about the Franchised Business or about Franchisor or its franchising program or policies made by Franchisor or by its officers, directors, shareholders, employees or agents which are contrary to the statements in Franchisor's disclosure document or to the terms of this Agreement, and that it understands and accepts the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain FA's high standards of quality and service and the

FA-Page 1

uniformity of those standards at all facilities which operate pursuant to the System and thereby to protect and preserve the goodwill of the Proprietary Marks; and

**WHEREAS,** Franchisee understands and acknowledges the importance of Franchisor's uniformly high standards of quality and service and the necessity of operating the Franchise Business granted hereunder in strict conformity with Franchisor's quality control standards and specifications.

**NOW, THEREFORE,** the parties, in consideration of the promises, undertakings and commitments of each party to the other set forth herein, hereby mutually agree as follows:

## I.    GRANT OF FRANCHISE

    **A.**    **Grant of Franchise.** Franchisor hereby grants to Franchisee a nonexclusive and personal license, right and authority to operate a Franchised Business only in the nonexclusive Designated Territory described in Section I.C of this Agreement. Franchisee hereby accepts such license according to the terms and conditions of this Agreement and agrees that Franchisee will perform all of its obligations in strict conformity with Franchisor's quality control standards and specifications that are a material part of the System, which may be periodically changed, improved and further developed.

    **B.**    **Grant of Franchise Package.**

        1.    **Franchise Package.**    In accordance with the CleanNet franchise packages listed in the *Initial Franchise Fee Price Schedule* in Attachment A, Franchisee has selected the following franchise package:

| | |
|---|---|
| Package Designation: | *P-30* |
| Initial Franchise Fee: | $ *11,800.00* |
| Gross Billings Per Month: | $ *2,500.00* |

After Franchisee completes initial training program as specified in Sections III.A.5 and V,D, Franchisor will provide accounts within the following number of days (indicate selection with a check mark in the blank next to the selection, and cross out the unchosen option):    _X_    120 days

_____    _____ days (an additional 30 days for each $1,000 in monthly Gross Billings over $3,000)

        2.    **Method of Payment.** On execution of this Agreement, Franchisee will pay the initial franchise fee to Franchisor in the following manner (indicate selection with a check mark in the blank next to the selection and cross out the unchosen option):

FA-Page 2

CleanNet-IL 0311
I have read, understood and agree with the statements on this page as written. Initial Here:  *R C.*  *J F S*

| | In Full | Franchisee will receive a 10% discount on the initial franchise fee stated in Section I.B.1, and will pay to Franchisor a total amount of $_____ . |
| --- | --- | --- |
| X | In Installments (Franchisor Financing) | Franchisee must pay $6,800.00 to Franchisor and sign a promissory note and guaranty of payment in the form of Attachment B for the $5,000 balance, that will be paid in equal monthly installments of $159.00 over a period of 36 months at an interest rate of 9%. |

3.     Initial Customer Accounts. Within the time period stated in Section I.B.1, Franchisor will provide to Franchisee janitorial customer accounts with the specified amount of Gross Billings per month as an initial customer base for Franchisee's business. Franchisee understands that the janitorial customer accounts that Franchisor will provide to Franchisee are intended to serve as an initial customer base for Franchisee and that the parties expect and anticipate that Franchisee will develop additional customer accounts to grow and expand its business. There shall be no limitation or constraints whatsoever placed on Franchisor with regard to respective sizes, revenues, location, type, or number of janitorial customer accounts that Franchisor may provide to Franchisee in order to satisfy the total amount of monthly Gross Billings Franchisor has agreed to provide to Franchisee. Once Franchisor provides Franchisee with the required janitorial customer accounts, Franchisor shall be deemed to have fulfilled its obligations.

4.     Replacement Customer Accounts. All customer accounts provided to Franchisee by Franchisor shall count toward the agreed monthly Gross Billings to be provided, regardless of whether such accounts are rejected, not accepted, or if service is discontinued by Franchisee, except as follow:  If a customer terminates the services of Franchisee within 180 days from the starting date of the customer's contract on grounds other than Franchisee's alleged default, Franchisor shall replace said account with another account of equal or greater monthly Gross Billings. Accounts terminated after 180 days from the start date of the customer's account and accounts terminated due to Franchisee's faulty workmanship, lack of trustworthiness, poor quality of work performed or such other default will not be replaced and said account shall continue to count toward Franchisor's obligation provision of accounts obligation under the specific franchise package purchased by Franchisee.

5.     Refundability. The initial franchise fee is fully earned on receipt by Franchisor and is non-refundable except as follows. The parties hereto expressly agree that it would be difficult to determine the consequential damages, if any, associated with Franchisor's failure to fill the account package, because of the many factors that determine the profitability of an individual cleaning account, including, but not limited to, the efficiency and productivity of Franchisee, the salaries that Franchisee pays its personnel, the cost of supplies, materials and equipment that would be used on the account and the terms of the contract for the account. In light of this difficulty, the parties agree that this provision for refund of all or a portion of the initial franchise fee is the exclusive remedy if Franchisor does not meet its obligation to fulfill Franchisee's account package as required by this Agreement; that any refund due to Franchisee

CleanNet-IL 0311
I have read, understood and agree with the statements on this page as written. Initial Here: RC, JES

for Franchisor's failure to fill the account package shall be in the nature of liquidated damages, and that Franchisor shall not be liable for any other claims of consequential damages, lost profit, losses incurred in connection with the franchise, or any other damages that Franchisee may claim to have suffered.

(a)     If, on expiration of the specified time period, Franchisor has failed to provide *any* customer accounts to Franchisee, then Franchisee may, within 10 days after expiration of the specified time period, give notice to Franchisor in accordance with Section XX and tender to Franchisor return of all start-up equipment and chemicals. Within 30 days after Franchisor's receipt of Franchisee's notice, Franchisor will terminate this Agreement and cancel any promissory notes. Franchisor will also pay to Franchisee a refund of all amounts paid to Franchisor if Franchisee returns all start-up equipment and chemicals in original unused condition. If Franchisee cannot return all equipment or chemicals in original unused condition, Franchisor may deduct the costs of used equipment or chemicals from the refund.

(b)     If, on expiration of the specified time period, Franchisor has provided at least one customer account to Franchisee but has failed to provide all of the accounts required by the franchise package selected, then Franchisee may, within 10 days after expiration of the specified time period, give notice to Franchisor in accordance with Section XX. Within 30 days after Franchisor's receipt of Franchisee's notice, Franchisor shall pay to Franchisee an amount equal to (1) the percentage of total accounts lacking, multiplied by (2) the initial franchise fee, multiplied by (3) 80%. (For example, if Franchisor has failed to provide 25% of the accounts, Franchisor will pay to Franchisee an amount equal to 80% of 25% of the initial franchise fee). Any refund will be reduced by any amounts financed by Franchisor, including accrued unpaid interest.

(c)     If Franchisee may request a refund under Sections 1.B.5(a) or (b), but Franchisee has not given notice to Franchisor, then the time period during which Franchisor may furnish Franchisee with all of the requisite accounts shall be automatically extended for 60 days, and Franchisor shall continue its efforts to furnish Franchisee with the agreed customer accounts. If Franchisor has not provided all of the requisite cleaning accounts at the end of the additional 60-day period, within 10 days after expiration of the 60-day period, Franchisee may give notice to Franchisor in accordance with Section XX. If Franchisee does not give notice to Franchisor of its request for refund, then the time period shall be automatically extended for additional 60-day periods until Franchisor has provided all of the requisite accounts or until Franchisee gives notice to Franchisor of its request for a refund within 10 days after the expiration of any such extended period.

(d)     On payment of any refund, Franchisor's obligation to provide additional initial accounts shall be considered fulfilled, and any further obligation in this regard shall be extinguished. The refund is a one-time reduction in the amount of the initial franchise fee. There is no refund or other compensation for reduced monthly billing on an ongoing basis, lost profits, or any other amounts whatsoever.

6.     Package Modification. If Franchisee, at any time after signing this Agreement, wishes to modify the franchise package, Franchisee may notify Franchisor. After reaching an agreement as to the package modification, the parties will enter into an agreement to

FA-Page 4

modify the franchise package in substantially the form of the Franchise Package Modification Addendum, attached to this Agreement as Attachment I.

      **C.**     **Nonexclusive Designated Territory.** Subject to the terms of this Agreement, Franchisor hereby grants to Franchisee the non-exclusive right and license to operate the Franchised Business within the jurisdictional boundaries of [W i l l ], Illinois (the "Designated Territory"). Due to the special nature of the Franchised Business, Franchisee is not granted an exclusive territory. Franchisee is required to use the System and Proprietary Marks solely within and throughout the Designated Territory. Franchisee is encouraged to develop and expand the Franchised Business within and throughout the Designated Territory.

      **D.**     **Reservation of Rights.** Franchisor may establish company-owned units, or license other franchisees to establish Franchised Businesses, at any site Franchisor deems appropriate. Franchisor reserves the right to offer, grant and support franchises in similar and other lines of business. Franchisor makes no representation or warranty to Franchisee that it will be granted any right to participate in any other franchises.

**II.**    **TERM AND RENEWAL**

      **A.**     **Initial Term.** Except as otherwise provided in this Agreement, the term of this Agreement shall be 10 years, commencing on the date of execution of this Agreement.

      **B.**     **Renewal Terms.** Franchisee may renew the license and continue the Franchised Business for successive 10-year periods, subject to the following conditions that must be met before renewal, unless and to the extent otherwise waived by Franchisor:

      1.     Franchisee shall not be in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor or its subsidiaries, affiliates and suppliers; Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and its subsidiaries, affiliates and suppliers and shall have timely met those obligations throughout the term of this Agreement; Franchisee's operation and management of the Franchised Business shall be in full compliance with the System; and Franchisee shall maintain and be in good standing with all of its necessary and applicable licenses and permits;

      2.     Franchisee shall give Franchisor notice of its intent to renew the license not less than six months before the end of the term of this Agreement;

      3.     After receipt of notice from Franchisee, but at least five months before the expiration of the current term of this Agreement, Franchisor shall inspect the Franchised Business and give notice to Franchisee of all required modifications to the nature and quality of the services offered by the Franchised Business, Franchisee's advertising, marketing and promotional programs, and the maintenance, refurbishing, equipment upgrade and equipment replacement necessary to comply with Franchisor's then-current standards and specifications. Franchisee shall complete, to Franchisor's satisfaction, all such required modifications, as well as adopt and implement any new methods, programs, modifications, techniques or operational systems required by Franchisor's notice no later than two months before expiration of the current term of this Agreement;

FA-Page 5

4.    Franchisee and its approved manager shall attend Franchisor's then current qualification and training programs at Franchisee's expense;

5.    Franchisee must execute Franchisor's then-current form of franchise agreement, which shall supersede in all respects this Agreement, and the terms of which may differ from the terms of this Agreement; and

6.    Franchisee, its shareholders, directors and officers shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries and affiliates, and their respective officers, directors, agents and employees.

If any of the conditions to renewal have not been met, no later than two months before the expiration of the initial term of this Agreement, Franchisor shall have no obligation to renew this Agreement and shall provide to Franchisee at least 45 days prior written notice of its intent not to renew this Agreement, which notice shall set forth the reasons for such refusal to renew.

## III.    DUTIES OF FRANCHISOR

A.    **Pre-Opening Obligations.** Before the opening of the Franchised Business, Franchisor's duties are as follows:

1.    to designate the Designated Territory in which Franchisee will operate the Franchised Business in accordance with Section I.C of this Agreement. Franchisor's designation of the Designated Territory as being suitable for a Franchised Business is not to be deemed a representation or warranty as to the likelihood of success;

2.    to provide Franchisee with guidelines and specifications for the operation and management of the Franchised Business, which guidelines and specifications Franchisee must adopt;

3.    to provide the equipment and products package, unless Franchisee has chosen the P-6XE or P-12XE franchise package;

4.    to loan to Franchisee a single copy of Franchisor's Confidential Operations Manual ("Manual") as periodically amended, which shall include standards and specifications for procedures, equipment, supplies, management and operation;

5.    to provide an initial training program. Within 10 to 20 business days after execution of this Agreement, Franchisor shall commence training Franchisee at Franchisor's facility or a location of Franchisor's choice. The initial training program will last up to three days, depending on Franchisee's experience, and will consist of practical on-site activities explaining the methods and procedures involved in the commercial cleaning business, as well as classroom training utilizing Franchisor's training curriculum and video/DVD series. As much as possible within its discretion, Franchisor will attempt to adapt its training program to meet the needs of Franchisee depending on Franchisee's level of prior training and experience. Franchisor will also provide Franchisee with home study materials designed to further Franchisee's understanding of chemicals and procedures employed to operate the Franchised Business; and

FA-Page 6

I have read, understood and agree with the statements on this page as written. Initial Here:  R.C.   J.E.S

6.     to assist Franchisee, at Franchisor's discretion and subject to the availability of Franchisor's personnel, with the location of an insurance agency from which to obtain the insurance required under Section XI of this Agreement.

**B.     Post-Opening Obligations.** The obligations of Franchisor after the opening of the Franchised Business are as follows:

1.     to furnish Franchisee with janitorial customer accounts amounting to the applicable Gross Billings per month under the franchise package that Franchisee selects within the time period specified in Section 1.B.1 of this Agreement.

2.     if a customer account is terminated for any reason other than Franchisee's alleged default within 180 days from the starting date of the account, to replace the account with another account of equal or greater monthly billings. Customer accounts terminated after 180 days will not be replaced (see also Section I.B.4 of this Agreement);

3.     to provide invoicing, billing and collection services. Each month, Franchisor will invoice Franchisee's customer(s) for the cost of services rendered by Franchisee plus applicable sales taxes (which Franchisor will remit on Franchisee's behalf to the appropriate taxing authorities). These monies will be collected by an escrow account ("Escrow Account") established by Franchisor. The Escrow Account will disburse the collected amounts to Franchisee on a monthly basis, after deduction of applicable sales taxes (for remittance to the appropriate taxing authorities), Franchisor's Administrative fee, the Royalty Fee, and after deduction of any payments due to Franchisor from Franchisee for amounts financed, for any advances made by Franchisor to Franchisee, for any transfer fees, for any products or equipment purchased or leased by Franchisee through Franchisor, for any insurance purchased by Franchisee through Franchisor, for any Advertising Fee contributions and for any Finder's Fees charged or financed by Franchisor. The Escrow Account will be administered by an escrow agent appointed by Franchisor, who will hold escrowed funds for the benefit of franchisees until their disbursement. Franchisor's invoicing and billing services will also be provided for those accounts generated by Franchisee through Franchisee's own solicitation and efforts;

4.     to provide such general advisory assistance deemed helpful to Franchisee by Franchisor in the ongoing operation of the Franchised Business. A representative of Franchisor will ordinarily be available at each of Franchisor's offices to answer routine questions or to assist with problems during normal business hours;

5.     coordinate and conduct periodic training programs on commercial-cleaning business operations for its network of franchisees as Franchisor deems necessary in its sole discretion;

6.     to provide Franchisee with updates, revisions and amendments to the Manual;

7.     to continue its efforts to establish and maintain high standards for franchisees, to promote quality, customer satisfaction and service, and to that end will on a periodic basis, conduct, as Franchisor deems advisable, quality control inspections as to the results, only, of Franchisee's performance at locations under Franchisee's care;

FA-Page 7

I have read, understood and agree with the statements on this page as written. Initial Here:   R. C   J.ES

8.      at Franchisor's sole discretion, to advance to Franchisee, through the Escrow Account, amounts billed to but not yet collected from Franchisee's customers on the terms and conditions specified in Section IV.B of this Agreement;

9.      to make its best effort to provide Franchisee with pricing expertise, sample proposals and references in order to facilitate growth of Franchisee's commercial-cleaning business on an ongoing basis and in order to help Franchisee effectively compete with local and national companies in their regional markets;

10.     to endeavor to negotiate, using its bargaining power, more competitive rates from cleaning supply companies; and

11.     at Franchisor's sole discretion, to provide a web site on the Internet or any comparable electronic network of computers to advertise and promote the franchise system, and services and products marketed by the franchise system, and/or provide intranet access. Franchisor may permit Franchisee to maintain a standard listing on its web site, or may allow Franchisee to establish and maintain a web page that may be subject to an additional fee. Any representations and warranties of any kind whatsoever, express or implied, regarding Franchisor's web site, including representations and warranties as to the operation, functionality, lack of interruption or resources, are expressly excluded. Without limiting the foregoing, Franchisor disclaims any implied warranties of merchantability and fitness for a particular purpose as to its web site. As to any malfunctioning of its web site, Franchisor will not be liable to Franchisee for any consequential, incidental, indirect, economic, special, exemplary or punitive damages, such as, but not limited to, loss of revenue or anticipated profits or lost business, even if Franchisee has advised Franchisor that such damages are possible as a result of any breach of warranty or malfunction.

C.      **Obligations Personal to Franchisee.** All of the obligations of Franchisor hereunder are to Franchisee, and no other party is entitled to rely on, enforce or obtain relief for breach of such obligations either directly or by subrogation.

D.      **Certificate of Performance.** After Franchisor performs its pre-opening obligations as described in Section III.A of this Agreement, Franchisor may ask Franchisee to execute a certification, in a form that Franchisor reasonably requests, confirming that Franchisor has satisfactorily performed its pre-opening obligations (a "Certificate of Performance.") If Franchisor makes the request, within three (3) days thereafter, Franchisee agrees to sign and deliver the Certificate of Performance to Franchisor or agrees to provide Franchisor with written notice describing the obligations that Franchisor has not satisfactorily performed. Franchisor agrees to notify Franchisee when it has completed any obligations identified in the notice, and Franchisee agrees to sign and deliver the Certificate of Performance within three (3) days thereafter.

IV.    **FEES**

A.      **Payments to Franchisor.** In consideration of the right and license to operate the Franchised Business granted herein as well as Franchisor's solicitation of janitorial customer

FA-Page 8

I have read, understood and agree with the statements on this page as written. Initial Here: _R C_ . _J F S_

accounts for Franchisee, during the term of this Agreement, Franchisee shall pay to Franchisor the following fees, all in U.S. Dollars:

      **1.**    **Initial Franchise Fee.** The total initial franchise fee payable to Franchisor by Franchisee according to the CleanNet franchise package selected by Franchisee is set forth in Section I.B.1 of this Agreement. The initial franchise fee is deemed fully earned by Franchisor on receipt and is non-refundable except as specified in Section I.B.5 of this Agreement.

      **2.**    **Royalty Fee.** Franchisee shall pay to Franchisor a continuing non-refundable monthly royalty fee ("Royalty Fee") equal to 5% of monthly Gross Billings. The escrow agent for the Escrow Account receiving customer payments will deduct and disburse to Franchisor the Royalty Fee in accordance with the payment procedures set forth in Section IV.C of this Agreement.

      **3.**    **Administrative Fee.** Franchisee shall pay to Franchisor a continuing non-refundable administrative fee ("Administrative fee") equal to 10% of monthly Gross Billings. The escrow agent for the Escrow Account receiving customer payments will deduct and disburse to Franchisor the Administrative fee in accordance with the payment procedures set forth in Section IV.C of this Agreement.

      **4.**    **Finder's Fee.** Franchisor may, at its discretion, offer additional customers to Franchisee beyond the initial package purchased. Franchisee has the option of accepting or refusing any offer of additional customers. If Franchisee accepts such additional customers, Franchisee agrees to pay Franchisor a Finder's Fee of two and three-quarters times the initial monthly Gross Billings of each such additional customer. The Finder's Fee must be paid to Franchisor or may be financed through Franchisor before Franchisee may begin work on the new accounts. If Franchisee elects to finance the Finder's Fee, and if Franchisor agrees at its sole option to finance the Finder's Fee, Franchisee will pay Franchisor a down payment equal to 50% of the Finder's Fee at the time each additional customer is accepted, and the balance will be financed by Franchisor for one year at 9% interest per annum, beginning with the first month services are performed for each new customer. The escrow agent for the Escrow Account receiving customer payments will deduct and disburse to Franchisor the monthly payment owed with respect to the financed portion of any Finder's Fee from the monthly billings of Franchisee's customer accounts. Royalty Fees, Administrative fees, and all other applicable fees will be assessed and are payable by Franchisee to Franchisor on all such additional customers in the same manner as if the customer had been provided as part of the initial franchise package. If a terminating customer was an additional account provided to Franchisee by Franchisor (beyond the initial franchise package), for which a Finder's Fee was payable to Franchisor, the termination of such customer will not relieve Franchisee's obligation to complete all Finder's Fee payments to Franchisor in full (whether or not financed).

      **5.**    **Royalty Fee and Administrative fee on Isolated or Non-Recurring Services.** Franchisee agrees to pay Franchisor a 10% Royalty Fee as well as a 10% Administrative fee on all Gross Billings generated from each isolated or non-recurring service performed, whether generated by Franchisee or Franchisor. Franchisor has the sole right to determine which contracts or services are isolated or nonrecurring; however, such services are generally those requested by the customer to be performed on an irregular basis, and are not included in the customer's standard Janitorial Service Agreement, and charges for such services

FA-Page 9

I have read, understood and agree with the statements on this page as written. Initial Here: R.C  JFS

are not regularly included in the customer's monthly billing. Such services generally include, but are not limited to, isolated requests for window washing, carpet shampooing, upholstery cleaning, and a wide variety of similar services. For all such services, regardless of whether they are solicited or obtained by Franchisee or Franchisor, Franchisee agrees to provide all equipment and chemicals necessary.

        **6.**    **Supply Replacement Fee.** If Franchisee has neglected to replace supplies at one or more of its customer locations and Franchisor replaces the supplies in accordance with Section V.R of this Agreement, Franchisee must immediately reimburse Franchisor in full for Franchisor's costs in connection with the supply replenishment. The escrow agent for the Escrow Account receiving customer payments will deduct and disburse to Franchisor any amounts owed by Franchisee under this Section from amounts received from Franchisee's janitorial customers.

        **7.**    **Technology Fees.** If Franchisor establishes a web site, and allows Franchisee to establish and maintain a web page through its web site, Franchisor may charge Franchisee a reasonable fee for any customized features, which fees will be periodically specified in the Manual or otherwise in writing. If Franchisor has proprietary, customized or other required software, Franchisee must pay Franchisor, its affiliate, or any designated supplier, any required initial or recurring periodic fee for initial or continued licensing, support or maintenance that may be periodically specified in our Manual or otherwise in writing.

        **8.**    **Advertising Fee.** If Franchisor, in its sole discretion, establishes a system-wide advertising fund, Franchisee shall pay to Franchisor, as a continuing non-refundable advertising contribution, an amount Franchisor periodically determines, that will not exceed 1% of monthly Gross Billings per month ("Advertising Fee"). The Advertising Fee will commence when Franchisor notifies Franchisee in writing.

        **9.**    **Key Return Fee.** If Franchisee fails to promptly return to a customer its keys, security passes or codes, whether the request is due to cancellation of a service contract or termination or expiration of this Agreement or any other reason as specified in Section V.O of this Agreement, and Franchisor is asked to re-key the customer's facility due to Franchisee's failure, then Franchisee must pay to Franchisor, on demand, the actual cost incurred by Franchisor, plus an administrative charge of $250.

        **B.**    **Definition of Gross Billings.** "Gross Billings" is defined as all sales generated through the Franchised Business including but not limited to fees for any and all services performed by Franchisee, whether for cash or credit, and income of every kind or nature related to the Franchised Business; provided, however, that "Gross Billings" shall not include any sales tax or other taxes that are collected from customers for transmittal to the appropriate taxing authority.

        **C.**    **Billing and Payment Procedures.** Franchisor will bill each of Franchisee's janitorial customer accounts, including those accounts generated by Franchisee, on a monthly basis. All fees referred to in this Franchise Agreement are due from Franchisee to Franchisor on the 25th day following the last day of the month during which services are performed. The escrow agent for the Escrow Account receiving customer payments will deduct from all fees received from Franchisee's janitorial customers and disburse to Franchisor any and all amounts due from Franchisee to Franchisor including, but not limited to all Royalty Fees, Administrative

FA-Page 10

CleanNet-IL 0311
I have read, understood and agree with the statements on this page as written. Initial Here: R.C    JFS

fees, Finder's Fees, transfer fees, handling fees, fees for insurance placed by Franchisee through Franchisor, payments on all Promissory Notes between Franchisee and Franchisor, all equipment lease payments due from Franchisee to Franchisor, and any other debts of whatever manner owed by Franchisee to Franchisor. Franchisor shall maintain billing and income records, and shall assist Franchisee in customer relations.

In connection with the performance of Franchisor's business services to Franchisee, Franchisee hereby irrevocably appoints Franchisor its true and lawful attorney-in-fact to take control in any manner of any cash or non-cash items of payment or proceeds thereof; to endorse the name of Franchisee on any checks, drafts, or other evidences of payments that may come into Franchisor's possession; to sign Franchisee's name on any notice of lien, claim of mechanic's lien, or assignment or satisfaction of mechanic's lien; and to do all other acts and things necessary, in Franchisor's sole judgment, to carry out this Agreement. All checks and other forms of remittance received by Franchisor as attorney-in-fact for Franchisee shall be endorsed: "Pay to the order of CleanNet of Illinois Escrow Account", or in such other manner as Franchisor may designate. Franchisee's signature or name may be inserted on all checks and other forms of remittance by Franchisor in longhand, in typewriting or by rubber stamp. Every such endorsement, however signed or made, shall be deemed the valid endorsement of Franchisee.

Franchisor shall be entitled to recover from Franchisee all reasonable attorney's fees, court costs and expenses, and out-of-pocket costs which may be incurred by Franchisor in enforcing payment of any accounts, whether against account debtors, Franchisee, borrowers, Franchisee's guarantors, or others, provided that Franchisee has authorized such action, except that an action against Franchisee or Franchisee's guarantors does not require Franchisee's authorization. All amounts paid to Franchisor for, by or on behalf of Franchisee, and all credits due Franchisee, shall first be applied in whole or in part to Franchisee's then due or past due obligations under this Agreement, and next to all other agreements, past, present or future, between Franchisor and Franchisee, to the extent and in the manner that Franchisor may see fit in its sole discretion.

**D.** **Advances.** On Franchisee's request, Franchisor may, at its sole discretion, advance to Franchisee, through the Escrow Account, amounts that have been billed to but have not yet been collected from Franchisee's customers. The amount of the advances, if any, will be limited to 60 days' billings per customer, and the duration of any advance will be 90 days per customer. If, at the end of 90 days from the date advanced, an amount advanced to Franchisee remains uncollected by Franchisor, Franchisee must immediately repay Franchisor the amount advanced in full. No interest is charged by Franchisor on such advances. At the sole option of Franchisor, any janitorial customer account may be declared a bad payment risk. On such declaration, Franchisor will no longer make any payments in advance to Franchisee for that account's monthly billings. Franchisee will thereafter only receive disbursements for such bad risk accounts after actual receipt by the Escrow Account of that account's monthly billing. On such bad risk accounts, Franchisor may advise Franchisee to cease servicing the account, but the ultimate decision whether to do so will be made by Franchisee, at its discretion. Franchisor is not required to take any particular action, including legal action, to enforce payment of accounts by a defaulting customer.

FA-Page 11

## V.    DUTIES OF FRANCHISEE

A.    **Compliance with System and Uniform Standards**. Franchisee understands and acknowledges that every detail of the appearance and operation of the Franchised Business in compliance with the System is critical to Franchisor, Franchisee and other franchisees in order to develop and maintain high and uniform operating standards; increase the demand for the services performed by franchisees; and protect the Proprietary Marks and the System, and Franchisor's trade secrets, reputation and goodwill. Franchisee shall operate the Franchised Business in conformity with such uniform methods, standards and specifications as Franchisor may periodically prescribe to ensure that the highest degree of quality and service is uniformly maintained. Franchisee shall conduct its business in a manner that reflects favorably at all times on the System and the Proprietary Marks. Franchisee shall never engage in deceptive, misleading or unethical practices or conduct any other act that may have a negative impact on the reputation and goodwill of Franchisor or any other franchisee operating under the System. While Franchisor has developed uniform operating standards and protocols that are required of, and that benefit, all franchisees, Franchisee retains complete and exclusive control over the means and methods used in performing services on a day-do-day basis and in operating its Franchised Business in a manner that meets or exceeds such operating standards and protocols.

B.    **Equipment and Performance**. Franchisee will provide all labor, equipment, facilities, materials, tools and supplies necessary to operate its business and to service its janitorial customer accounts, including all janitorial services called for in each customer contract, except those items of equipment provided by the customer contract. Franchisee agrees to maintain in sufficient supply as Franchisor may prescribe in the Manual or otherwise in writing and use at all times only such products and supplies as conform to Franchisor's standards and specifications as contained in the Manual, and to refrain from deviating therefrom without Franchisor's prior written consent. Franchisee agrees to lease or purchase at Franchisee's expense all of the equipment that Franchisor may reasonably periodically specify as meeting minimum standards for franchisees in the Manual or otherwise in writing. All services will be provided and/or supervised by Franchisee and performed in a competent manner, satisfactory to the customer.

C.    **Procurement of Business License**. Franchisee shall obtain at its own cost and expense all business licenses, permits and certifications required for the opening and ongoing operation of the Franchised Business and shall certify in writing to Franchisor on request that all such licenses, permits and certifications have been obtained and are in good standing. Franchisee agrees to maintain all licenses and permits in good standing during the term of this Agreement.

D.    **Initial Training**. In accordance with the terms and conditions set forth in Section III.A.5 hereof, Franchisee or its designee and Franchisee's manager shall attend and complete Franchisor's initial training program to the full satisfaction of Franchisor in its sole discretion. Franchisee must take and pass a test on each training subject at the conclusion of each session. If Franchisee fails a test, Franchisee must retake the test until Franchisee achieves a passing score.

E.    **Ongoing Training**. Franchisee shall cause its manager, and any person subsequently acting as the manager of the Franchised Business, to attend and complete, to

FA-Page 12

I have read, understood and agree with the statements on this page as written. Initial Here: ℓ.C   JES

Franchisor's reasonable satisfaction, such special programs or periodic additional training as Franchisor may periodically require in writing. Franchisor shall only provide and pay for instruction and training materials in connection with such additional training. Franchisee shall be responsible for any and all other expenses incurred in training, including, without limitation, the costs of meals, entertainment, lodging, travel, laundry and wages.

**F.**     **Telephone and Cellular Phone.** Due to the nature of the janitorial maintenance business, and the need to react quickly to the needs of janitorial customers, Franchisee agrees to provide Franchisor with the number of a working telephone and/or cellular telephone at which Franchisor may reach Franchisee, one of its principals or its Manager at any time. Franchisee remains obligated to be readily available during business hours (see Section V.I) and to otherwise fully comply with Franchisor's specifications regarding business communications.

**G.**     **Information Technology Requirements; Computer Hardware and Software; Personal Digital Assistant (PDA).** Franchisee acknowledges that information systems and communication methods have dramatically changed and advanced; can be expected to continue to change and advance; and Internet access and computer technology are necessary and advisable in business today. Franchisee therefore agrees to have available the necessary computer hardware and software to communicate over the Internet and online, as those terms are commonly understood, including a hand-held PDA with Internet access and the ability to send and receive electronic mail. Franchisee agrees to maintain an active email address which shall, at all times, be provided to Franchisor. If Franchisor approves a software program or other technology for the operation of the Franchised Business, Franchisee must promptly purchase any computer hardware needed to run the approved software or technology; license the approved software or technology; pay any initial fees and thereafter pay any required periodic fees as specified in Section IV.A.7 of this Agreement.

**H.**     **Web Sites and Listings.** Without Franchisor's prior written consent, Franchisee may not establish its own web site, or otherwise advertise, market or promote the Franchised Business on the Internet. Franchisee may not register any domain name containing the Proprietary Marks or any variation of the Proprietary Marks. Franchisee acknowledges and agrees that Franchisor will own all rights to and interest in each telephone number and telephone directory listing, email address, domain name and comparable electronic identity that is associated in any manner with the Proprietary Marks ("Listing"). Franchisee acknowledges and agrees that all goodwill arising from or in connection with the use of each Listing will inure to Franchisor's benefit. Promptly after expiration, termination, or transfer of the Franchise, Franchisee will notify each telephone or Internet service provider with whom Franchisee has any Listing and direct them to transfer the Listing to Franchisor, or its designee, at Franchisee's expense; and Franchisee agrees to execute all documents necessary to complete these transfers. On execution of this Agreement, Franchisee will sign a transfer of service consent and authorization (Attachment H), granting Franchisor the authority to change, transfer or terminate any Listing on Franchisee's behalf; provided, that Franchisor agrees to use Attachment H only if Franchisee does not comply fully with this Section V.H and Section XIV.G of this Agreement.

**I.**     **Display of Proprietary Marks and Logos.** Franchisee agrees to purchase and maintain any and all signs for use at the Franchised Business, whether for interior or exterior use, in conformity with Franchisor's quality control standards and specifications. Franchisee shall

FA-Page 13

I have read, understood and agree with the statements on this page as written. Initial Here: R.C   JFS

display Franchisor's Proprietary Marks and logos on uniforms and otherwise in the manner prescribed by Franchisor. The color, design and location of said displays shall be specified by Franchisor and may be periodically changed in the sole discretion of Franchisor. Franchisee shall not display any other signs or posters, unless required by law or regulation, without the prior written consent of Franchisor.

J.    **Supervision Requirements.** The Franchised Business shall at all times be under the direct supervision and control of Franchisee (or if Franchisee is a legal entity, one of its principal shareholders, members or partners, as the case may be, as designated by Franchisee) who: has attended and successfully completed Franchisor's initial training program; and must devote his or her full time and energy during business hours to the supervision and management of the Franchised Business, unless otherwise exempted by permission of Franchisor. Franchisee agrees to maintain a competent, conscientious staff. Franchisee agrees to employ a sufficient number of employees to meet or exceed the uniform operating standards and to comply with all applicable federal, state and local laws, rules and regulations with respect to such employees. Subject only to Franchisor's right to approve Franchisor's selection of a designated manager under Section XV.A, Franchisee shall retain the exclusive right of approval and control over and responsibility for recruiting, hiring, firing, compensation, supervision and discipline of Franchisee's personnel, the working conditions of Franchisee's personnel and the employment policies and procedures governing such personnel.

K.    **Operation of the Franchised Business.** Franchisee shall use the Franchised Business solely for the operation of the Franchised Business that is licensed hereunder in strict accordance with the Manual; Franchisee agrees to sell or offer for sale only such services as meet Franchisor's uniform standards and which have been expressly approved for sale in writing by Franchisor in accordance with Franchisor's methods and techniques; to sell or offer for sale all approved services; to refrain from any deviation from Franchisor's standards and specifications; and to discontinue selling and offering for sale any such services as Franchisor may, in its sole discretion, disapprove in writing at any time. Franchisee shall keep the Franchised Business open and in normal operation for such minimum hours and days as Franchisor may periodically prescribe. Franchisee agrees to be available during normal business hours or any other reasonable time convenient to a customer for a walk-thru at the customer's facility, with a representative of the customer or Franchisor's representative or both and/or to meet and become familiar with the facility and alarm code, and/or facility key pick up. Normal business hours are defined as from 8 am to 5 p.m. Monday thru Friday, excluding National holidays.

L.    **Health and Safety Standards.** Franchisee shall meet and maintain the highest safety standards and ratings applicable to the operation and management of the Franchised Business and its personnel as Franchisor may reasonably require. Franchisee agrees to maintain safe work areas and a safe place of business in accordance with OSHA and other governmental and industry standards. Franchisee will make use of cautionary signs to warn of hazardous conditions or materials.

M.    **Proprietary Methods.** Franchisee acknowledges and agrees that Franchisor has developed certain products, services, operational systems and management techniques and may continue to develop additional products and proprietary methods and techniques for use in the

CleanNet-IL 0311
I have read, understood and agree with the statements on this page as written. Initial Here: R.C    JFS

operation of the Franchised Business which are all highly confidential and which are trade secrets of Franchisor. Because of the importance of quality control, uniformity of product and the significance of such proprietary products in the System, it is to the mutual benefit of the parties that Franchisor closely controls the dissemination of this proprietary information. Accordingly, Franchisee agrees that if such information and techniques become a part of the System, Franchisee shall comply and strictly follow these techniques in the operation of its business and shall purchase from Franchisor, or from an approved source designated by Franchisor, any supplies or materials necessary to protect and implement such techniques.

**N.** **Development of the Market.** Franchisee shall at all times use its best efforts to promote and increase the sales and consumer recognition of the services offered by Franchisee's business pursuant to the System and the Manual, to effect the widest and best possible distribution of Franchisee's services and to devote its best efforts in controlling its business, its managers, assistants and employees. Franchisee may request assistance from Franchisor in developing price quotes and/or in develop customer contracts. Franchisee retains the right to enter into contracts with customers directly, provided that such contracts provide for all customer payments to be made through the Escrow Account and made payable to the order of CleanNet of Illinois Escrow Account, and that all contracts are in writing and clearly disclose that Franchisee is an independently owned and operated business and that the contract is binding only on Franchisee, not Franchisor. Franchisee shall promptly provide Franchisor with a copy of any contract entered into with a customer so Franchisor can incorporate the new information into its billing and collections systems. Franchisee agrees to be solely responsible for servicing or providing experienced employees or sub-contractors to service Franchisee's customers and to be responsible for providing services to customers in accordance with contractual commitments. Franchisor is not obligated to replace any terminated customer account except as specified in Sections I.B.4 and III.B.4.

**O.** **Security.** Franchisee is responsible for all keys to the customers' premises and for ensuring that its personnel observe all security systems and precautions necessary or required at the customers' premises. If Franchisee's services are discontinued for any reason or if this Agreement expires or is terminated for any reason, Franchisee agrees to return all keys and security codes and cards within 24 hours of notification. Franchisee's failure to return a customer's keys for any reason renders Franchisee liable for the charges incurred to change the customer's locks and/or any other charges that may be incurred as a result of Franchisee's failure to return customer keys and/or security cards. If Franchisee fails to comply with its obligations, Franchisor may pay for changing a customer's locks and charge Franchisee as specified in Section IV.A.9 of this Agreement.

**P.** **Supply Replacement.** Franchisee shall be solely responsible for monitoring and maintaining the supply levels at its customer locations. Franchisee shall replace supplies at its customer locations in accordance with the Manual or as specified by the janitorial customer. If Franchisee fails to satisfy this provision and Franchisor replaces supplies for Franchisee, Franchisee must immediately reimburse Franchisor in full for Franchisor's costs associated with the supply replenishment, and pay a $50 administrative handling fee.

FA-Page 15

**Q.** **Working Capital.** Franchisor strongly recommends that Franchisee maintain sufficient levels of working capital for use in connection with the management and operation of the Franchised Business.

**R.** **Other Requirements.** Franchisee shall comply with all other requirements set forth in this Agreement, in the Manual or as Franchisor may periodically designate.

## VI. PROPRIETARY MARKS

**A.** **Grant of License.** Franchisor hereby grants Franchisee the non-exclusive right and license to use the **CleanNet** mark and any logo derived therefrom in connection with the operation of its Franchised Business and the provision of services to its customers.

**B.** **Conditions for Use.** With respect to Franchisee's use of the Proprietary Marks pursuant to the license granted under this Agreement, Franchisee agrees that:

1. Franchisee shall use only the Proprietary Marks designated by Franchisor and shall use them only in the manner required or authorized and permitted by Franchisor.

2. Franchisee shall use the Proprietary Marks only in connection with the right and license to operate the Franchised Business granted hereunder.

3. During the term of this Agreement and any renewal hereof, Franchisee shall identify itself as a licensee and not the owner of the Proprietary Marks and shall make any necessary filings under state law to reflect such status. In addition, Franchisee shall identify itself as a licensee of the Proprietary Marks on all invoices, order forms, receipts, business stationery and contracts, as well as the display of a notice in such form and content and at such locations as Franchisor may designate in writing.

**C.** **Acknowledgment.** Franchisee expressly understands and acknowledges that Franchisor is the exclusive owner of all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them; that the Proprietary Marks are valid and serve to identify the System and those who are licensed to operate a Franchised Business in accordance with the System; and that Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks, except the nonexclusive license granted herein.

## VII. CONFIDENTIAL MANUAL

**A.** **Compliance.** In order to protect the reputation and goodwill of Franchisor and all franchisees and to maintain uniform standards of operation in connection with the Proprietary Marks, Franchisee shall conduct its business in strict compliance with the operational systems, procedures, policies, methods and requirements prescribed in the Manual and any supplemental bulletins, notices, revisions, modifications or amendments thereto, all of which shall be deemed a part thereof. One registered Manual shall be provided to Franchisee on loan from Franchisor during the initial training program, and Franchisee shall sign a corresponding receipt therefore.

FA-Page 16

**B.** **Use.** Franchisee agrees to immediately adopt and use the programs, services, methods, standards, materials, policies and procedures set forth in the Manual, as they may be periodically modified by Franchisor. Franchisee acknowledges that Franchisor is the owner or licensee of all proprietary rights in and to the System, and the Manual, and any changes or supplements thereto.

**C.** **Confidentiality.** Franchisee shall at all times treat the Manual, any other manuals created for or approved for use in the operation of the Franchised Business and all of the information contained therein as proprietary and confidential, and shall use all reasonable efforts to maintain such information as confidential.

**D.** **Trade Secrets.** Franchisee acknowledges, knows and agrees that designated portions of the Manual are "trade secrets" owned and treated as such by Franchisor.

**E.** **Access.** The trade secrets must be accorded maximum security consistent with Franchisee's need to make frequent reference thereto. Franchisee shall strictly limit access to the Manual to employees who have a demonstrable and valid need to know the information contained therein in order to perform their duties. Franchisee shall strictly follow any provisions in the Manual regarding the care, storage and use of the Manual and all related proprietary information.

**F.** **Duplication.** Franchisee shall not at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise reproduce in any manner any part of the Manual, updates, supplements or related materials, in whole or in part, or otherwise make the same available to any unauthorized person.

**G.** **Franchisor's Property.** The Manual shall remain, at all times, the sole property of Franchisor. On the expiration or termination of this Agreement for any reason, Franchisee shall return to Franchisor the Manual and all supplements thereto.

**H.** **Updates or Revisions.** Franchisor retains the right to prescribe additions to, deletions from or revisions to the Manual, which shall become binding on Franchisee on being mailed or otherwise delivered to Franchisee, as if originally set forth therein. The Manual, and any such additions, deletions or revisions thereto, shall not alter Franchisee's rights and obligations hereunder.

**I.** **Master Set.** Franchisee shall at all times insure that its Manual is kept current and up-to-date, and in the event of any dispute as to the contents of the Manual, the terms contained in the master set of the Manual maintained by Franchisor at Franchisor's headquarters shall be controlling.

**J.** **Replacement Fee.** If the Manual is lost, stolen or destroyed, Franchisee shall pay Franchisor a non-refundable replacement fee of $100 for each volume of the replacement Manual.

## VIII. CONFIDENTIAL INFORMATION

**A.** **Confidential Relationship.** The parties expressly understand and agree that the relationship established between Franchisor and Franchisee by this Agreement is one of confidence and trust, and that as a result, Franchisor will be disclosing and transmitting to Franchisee certain trade secrets and other confidential and proprietary information (the "Confidential Information") concerning various aspects of Franchisee's operation of the Franchised Business, its methods of operation, techniques and all proprietary systems, procedures and materials relevant thereto pursuant to the System and this Agreement.

**B.** **Obligations of Franchisee.** In order to preserve and protect the Confidential Information that will be disclosed to Franchisee during the term of this Agreement, Franchisee agrees that Franchisee shall treat and maintain the Confidential Information as confidential both during the term of this Agreement and thereafter and that Franchisee shall restrict disclosure of the Confidential Information to only those of its employees or agents who are directly connected with the performance of work requiring knowledge thereof and shall disclose only so much of the Confidential Information as is required to enable those employees or agents to carry out their assigned duties.

## IX. ACCOUNTING, RECORDS, REPORTS, INSPECTIONS AND AUDITS

**A.** **Accounting.** In accordance with Section IV.B of this Agreement, Franchisor will bill each of Franchisee's customer accounts, including those accounts generated by Franchisee, on a monthly basis. In consideration of Franchisor's billing and accounting services, Franchisee pays to Franchisor the monthly Administrative fee set forth in Section IV.A of this Agreement.

**B.** **Records.** Franchisee shall maintain during the term of this Agreement and shall preserve for not less than seven years from the date of preparation full, complete and accurate books, records and accounts in accordance with the System and in the form and manner periodically prescribed by Franchisor in the Manual or otherwise in writing.

**C.** **Other Submissions.** Franchisee shall provide to Franchisor, at least twice a month (or such other times as Franchisor may periodically reasonably specify in writing), an inspection report signed by the customer for each customer location being serviced. Franchisee shall also submit to Franchisor such other forms, reports, and any and all other information and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, on request and as periodically specified in the Manual or otherwise in writing, at any time during the term of this Agreement.

**D.** **Inspection of Premises.** Franchisor may at its sole discretion, and without giving prior notice, perform periodic quality control visits to each location under the care of Franchisee. During such visits, all Franchisee operations are inspected and recommendations to correct deficiencies, improve techniques, and enhance the efficiency of Franchisee may be offered. If given prior notice, Franchisee or its Manager must be present and must cooperate fully with Franchisor's agents in such inspections by rendering such assistance as they may reasonably request.

CleanNet-IL 0311
I have read, understood and agree with the statements on this page as written. Initial Here: _R.C_   _JES_

**E.** **Audit.** On Franchisor's reasonable written request, at mutually agreeable times during Franchisee's normal business hours, Franchisee shall allow Franchisor or its designee reasonable access to Franchisee's books and records to ascertain whether amounts are due to Franchisor under this Agreement. Franchisee agrees to arrange access within 15 business days after Franchisor's request. Each audit shall be limited to the pertinent records for any period ending not more than 24 months before the date of request. Franchisor shall not be permitted to audit the same period of time more than once and Franchisor cannot exercise its audit rights under this Section more than once in any 12-month period. Franchisor or its designee will prepare a written report stating whether any discrepancies were found. Franchisor shall hold in strict confidence all information disclosed to it, except to the extent necessary for Franchisor to enforce its rights under this Agreement. All audit costs will be paid by Franchisor unless an audit reveals any underpayment by Franchisee of 5% or more of the amount payable to Franchisor during the period audited.

## X.  ADVERTISING

**A.** **Advertising Fund.** Franchisor has not yet established a system-wide advertising fund and does not currently require its franchisees to make advertising contributions; however, Franchisor reserves the right to establish and operate a system-wide advertising fund and to charge Franchisee an advertising fee (see Section IV.A.8 of this Agreement).

**B.** **Submission and Approval of Promotional and Marketing Materials.** All promotional and marketing materials to be used by Franchisee in any medium shall be presented in a dignified manner and shall conform to such standards and requirements as Franchisor may periodically specify in the Manuals or otherwise. Franchisee shall submit to Franchisor for its prior written approval, samples of all promotional and marketing materials in whatever form that Franchisee desires to use. Franchisee shall comply with all revisions to said promotional and marketing materials that Franchisor may require before approving said promotional and marketing materials. Franchisee shall not use any advertising or promotional plans or materials that have not been approved in writing by Franchisor, and Franchisee shall cease to use any plans or materials promptly on notice by Franchisor. Failure by Franchisee to obtain the prior written approval of Franchisor for all proposed advertising may be deemed a default of this Agreement in accordance with Section XIII.A of this Agreement.

## XI.  INSURANCE

**A.** **Procurement.** Franchisee shall procure, before the commencement of any operations under this Agreement, and thereafter maintain in full force and effect during the term of this Agreement, at Franchisee's expense, the following:

1. Comprehensive general liability insurance, including contractual liability, broad form property damage, personal injury, product liability, completed operations and independent contractors coverage, and fire damage coverage protecting against any loss, liability, personal injury, death, property damage or expense whatsoever from fire, lightning, theft, vandalism, malicious mischief and the perils included in the extended coverage endorsement, arising or occurring on or in connection with the Franchised Business, or by reason of the operation of the Franchised Business, in the amount of $1,000,000;

FA-Page 19

I have read, understood and agree with the statements on this page as written. Initial Here: _R C_ . _JFS_

2.     Automobile liability insurance with a limit of at least $500,000 on each owned, non-owned or hired vehicle used in the operation of the Franchised Business;

3.     Umbrella commercial liability with a limit of at least $5,000,000 per occurrence and aggregate, with the commercial general liability, automobile liability and workers' compensation/employer's liability as underlying policies;

4.     Blanket Fidelity Bond in the amount of $10,000; and

5.     Worker's compensation and employer's liability insurance as well as such other insurance as may be required by statute or rule of the state in which the Franchised Business is located and operated and such other insurance applicable to such other special risks, if any, as Franchisor may reasonably require for its own and Franchisee's protection.

B.     **Minimum Coverage.** Such policy or policies shall be written by an insurance company satisfactory to Franchisor in accordance with the standards and specifications set forth in the Manual or otherwise in writing, and shall include, at a minimum the limits specified in this Agreement and any higher policy limits may reasonably be periodically specified by Franchisor in the Manual or otherwise in writing. Franchisor specifically reserves the right to increase or decrease the minimum limits listed herein above as well as to add new types of required coverage.

C.     **Certificates.** At least 30 days before the grand opening of the Franchised Business (or on commencement of initial training if earlier), and on each policy renewal date thereafter, Franchisee shall submit to Franchisor, original or duplicate copies of all policies and policy amendments. The evidence of insurance shall include a statement by the insurer that the policy or policies will not be cancelled or materially altered without at least 30-days prior written notice to Franchisor.

D.     **Additional Insured and Independence of Coverage Requirements.** Each insurance policy that Franchisee maintains for the Franchised Business must: name Franchisor, and its successors, assigns, shareholders, partners, officers, directors, employees and agents as additional insureds; require the insurer to defend each person or entity if there is a claim; provide that any liability coverage afforded applies separately to each person or entity against whom a claim is brought as though a separate policy had been issued to that person or entity; contain no provision that limits or reduces coverage if there is a claim by one or more additional insured. Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, and Franchisee's performance of that obligation shall not relieve it of liability under the indemnity provision set forth in Section XVIII. Coverage for the additional insureds will apply on a primary basis irrespective of any other insurance, whether or not collectable

E.     **Failure to Procure.** Should Franchisee for any reason fail to procure or maintain the insurance required by this Agreement, as periodically revised for all franchisees by the Manual or otherwise in writing, Franchisor shall have the right and authority (without, however, any obligation) to immediately procure such insurance and to charge the same to Franchisee,

I have read, understood and agree with the statements on this page as written. Initial Here: _RC_  _JFS_

which charges, together with a reasonable fee for Franchisor's expenses in so acting, including but not limited to attorneys' fees, shall be payable by Franchisee immediately on notice.

F.    **Third Parties.** Franchisee shall ensure that all third parties with whom Franchisee conducts business, are properly insured.

## XII.  TRANSFER OF INTEREST; OPERATION BY FRANCHISOR

A.    **Transfer by Franchisor.** Franchisor shall have the right to assign this Agreement, and all of its rights and privileges hereunder, to any person, firm, corporation or other entity provided that, with respect to any assignment resulting in the subsequent performance by the assignee of the functions of Franchisor: (1) the assignee shall, at the time of such assignment, be capable of performing the obligations of Franchisor hereunder, and (2) the assignee shall expressly assume and agree to perform such obligations.

B.    **Transfer by Franchisee.**

1.    Neither Franchisee, any immediate or remote successor to any part of Franchisee's interest in the Franchised Business, any individual, partnership, corporation or other legal entity which directly or indirectly controls Franchisee, if Franchisee is a corporation, nor any general partner or any limited partner (including any corporation which controls, directly or indirectly, any general or limited partner) if Franchisee is a partnership, shall sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber any direct or indirect interest in Franchisee or in the Franchised Business without the prior written consent of Franchisor, which consent may not unreasonably be withheld; provided, however, that Franchisor's prior written consent shall not be required for a transfer of less than a 5% interest in a publicly-held corporation or for transfer to a wholly-owned corporation of Franchisee formed expressly for that purpose. For such purposes, and under this Agreement in general, a publicly held corporation is a "Reporting Company" as that term is defined by the Securities Exchange Act of 1934. Franchisee must notify Franchisor in writing at least 60 days before the date of the intended sale or assignment. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor shall be invalid and shall constitute a material breach of this Agreement, for which Franchisor may then terminate without opportunity to cure pursuant to Section XIII.A of this Agreement.

2.    Franchisor shall not unreasonably withhold its consent to a transfer of any interest in Franchisee or in this Agreement. If, however, a transfer, alone or together with other previous, simultaneous or proposed transfers, would have the effect of transferring a controlling interest in the Franchised Business, Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval:

a.    All of Franchisee's accrued monetary obligations and all other outstanding obligations to Franchisor, its subsidiaries, affiliates and suppliers shall be up to date, fully paid and satisfied;

FA-Page 21

      b.     Franchisee shall not be in default of any provision of this Agreement, any amendment hereof or successor hereto, any other franchise agreement or other agreement between Franchisee and Franchisor, or its subsidiaries, affiliates or suppliers;

      c.     Franchisee and each of its partners, shareholders, members, officers and directors shall have executed a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its officers, directors, shareholders and employees in their corporate and individual capacities, including, without limitation, claims arising under federal, state and local laws, rules and ordinances;

      d.     Franchisee shall remain liable for all direct and indirect obligations to Franchisor in connection with the Franchised Business before the effective date of the transfer, shall continue to remain responsible for its obligations of nondisclosure, noncompetition and indemnification as provided elsewhere in this Agreement and shall execute any and all instruments reasonably requested by Franchisor to further evidence such liability;

      e.     Franchisee must adequately train the transferee and its manager in the field operations of the Franchised Business;

      f.     The transferee shall demonstrate to Franchisor's satisfaction that the transferee meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to operate the Franchised Business (as may be evidenced by prior related experience or otherwise); has at least the same managerial and financial criteria required of new franchisees; and shall have sufficient equity capital to operate the Franchised Business;

      g.     The transferee shall either assume this Agreement by signing a document substantially similar to Attachment J or, at Franchisor's option, execute Franchisor's then-current standard form of franchise agreement, and such other ancillary agreements as Franchisor may require for the Franchised Business, for a term ending on the expiration date of this Agreement. Any new franchise agreement shall supersede this Agreement in all respects; and the provisions of the new franchise agreement may differ from the terms of this Agreement. If the transferee is not an individual, the shareholders, members, partners or other owners of the transferee shall jointly and severally guarantee the obligations of transferee in writing in a form satisfactory to Franchisor, and sign an Acknowledgment of Receipt of all required legal documents;

      h.     The transferee shall upgrade, at the transferee's expense, the Franchised Business to conform to the then current specifications then being used in new Franchised Businesses, and shall complete the upgrading and other requirements within the time specified by Franchisor;

      i.     The transferee and its manager shall complete any classroom training programs then in effect for current franchisees on such terms and conditions as Franchisor may reasonably require unless such persons have been trained previously by Franchisor;

I have read, understood and agree with the statements on this page as written. Initial Here: R C  JFS

j.      The transferee or Franchisee shall pay to Franchisor a transfer fee equal to 10% of Franchisee's yearly gross income on all customer accounts assigned to Franchisee at the time of transfer up to a combined maximum amount of $2,000.

C.      **Franchisor's Right of First Refusal.** Any party who holds an interest (as reasonably determined by Franchisor) in Franchisee or in the Franchised Business and who desires to accept any bona fide offer from a third party to purchase his interest shall notify Franchisor in writing of each such offer and, except as otherwise provided herein, Franchisor shall have the right and option, exercisable within 30 days after receipt of such written notification, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party less any amount of the purchase price attributable to the goodwill associated with the Franchised Business, the Proprietary Marks or the System. Any material change in the terms of any offer before closing shall constitute a new offer subject to the same right of first refusal by Franchisor as in the case of an initial offer. If Franchisor elects to purchase the seller's interest, closing on such purchase must occur by the later of: (a) the closing date specified in the third party offer; or (b) within 60 days from the date of notice to the seller of Franchisor's election to purchase. Failure of Franchisor to exercise the option afforded by this Section XII.C shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section XII, with respect to a proposed transfer. If the consideration, terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, then Franchisor may purchase the Franchised Business proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree, within a reasonable time, on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by a third party, an independent appraiser shall be designated by Franchisor, and his determination shall be final and binding.

D.      **Transfer to Legal Entity.** If Franchisee is an individual or sole proprietorship, Franchisee may transfer this Agreement to a corporation, limited liability corporation, limited liability company, partnership or other legal entity ("legal entity") if Franchisee fulfills the following requirements (also see Attachment E):

1.      Franchisee must be the owner of all of the ownership interests in the legal entity; or if Franchisee is more than one individual, each individual must have the same proportionate ownership interest in the legal entity as he or she had in Franchisee before the transfer to the legal entity.

2.      Franchisee or another person who has successfully completed initial training must act as the principal operating officer of the legal entity.

3.      The legal entity's activities will be confined exclusively to operating the Franchised Business.

4.      Each stock certificate, certificate of interest or other evidence of ownership will have conspicuously endorsed on its face a statement, in a form satisfactory to Franchisor, that ownership and further transfer is subject to his Agreement.

CleanNet-IL 0311
I have read, understood and agree with the statements on this page as written. Initial Here: _RC._  _JFS_

5.     Copies of the legal entity's Certificate and Articles of Incorporation or Certificate and Agreement of Partnership or Certificate and Articles of Organization; By-Laws or Partnership Agreement or Operating Agreement; resolutions and any other significant governing documents, will be furnished promptly to Franchisor on request.

6.     In accordance with Section XXIV.D of this Agreement, all shareholders, members, partners or other beneficial owners of any legal entity will, jointly and severally, personally bind themselves to the restrictive covenants of the Agreement and any related agreements and personally guarantee the legal entity's performance under the Agreement in a form satisfactory to Franchisor.

7.     Franchisee will maintain a current list of shareholders, members, partners or other beneficial owners and will furnish the list to Franchisor promptly on request.

8.     Franchisee will not be required to pay a transfer fee for the first transfer to a legal entity that Franchisee controls, but for a second or any additional transfers, Franchisor may require payment of the same transfer fee as provided in Section XII.B.2.j of this Agreement.

E.     **Transfer On Death or Mental Incapacity**. On the death, mental incapacity or disability of Franchisee or its principal shareholder, member or partner, Franchisor shall consent to the transfer of said interest in Franchisee, the Franchised Business and this Agreement to the spouse, heirs or relative by blood or by marriage, of said Franchisee, shareholder, member or partner, whether such transfer is made by will or by operation of law, if, in Franchisor's sole discretion and judgment, such person or persons meet Franchisor's educational, managerial and business standards; possess a good moral character, business reputation and credit rating; have the aptitude and ability to conduct the Franchised Business herein; have at least the same managerial and financial criteria required by new franchisees and shall have sufficient equity capital to operate the Franchised Business. If said transfer is not approved by Franchisor, the executor, administrator or personal representative of such person shall transfer his interest to a third party approved by Franchisor within six months after such death, mental incapacity or disability. Such transfer shall be subject to Franchisor's right of first refusal under Section XII.C and to the same conditions as any inter vivos transfer under Section XII.B.

F.     **Operation of the Franchised Business by Franchisor**. In order to prevent any interruption of the business of the Franchised Business and any injury to the goodwill and reputation thereof which would cause harm to the Franchised Business and thereby depreciate the value thereof, Franchisee hereby authorizes Franchisor, and Franchisor shall have the right, but not the obligation, to operate said Franchised Business for so long as Franchisor deems necessary and practical, and without waiver of any other rights or remedies Franchisor may have under this Agreement, if: (1) any of Franchisee's principals, shareholders, members or partners is absent or incapacitated by reason of illness or death and that Franchisee is not, therefore, in the sole judgment of Franchisor, able to do the business licensed hereunder, or (2) any allegation or claim is made against the Franchised Business, Franchisee or any principals, shareholders, members, partners, officers, directors or employees of Franchisee, involving or relating to misrepresentations or any fraudulent or deceptive practice. If Franchisor should elect to operate the Franchised Business, Franchisor at its option shall not be obligated so to operate it for a period more than 90 days. All revenues from the operation of the Franchised Business during

FA-Page 24

I have read, understood and agree with the statements on this page as written. Initial Here: R.C   JFS

such period of operation by Franchisor shall be kept in a separate account and the expenses of the Franchised Business, including reasonable royalty fees, advertising contributions, compensation and expenses for Franchisor's representative, shall be charged to said account. If, as herein provided, Franchisor elects to temporarily operate the Franchised Business on behalf of Franchisee, Franchisee hereby agrees to indemnify and hold Franchisor harmless from any and all claims arising from the acts and omissions of Franchisor and its representatives.

      **G.**    **Non-Waiver of Claims.** Franchisor's consent to a transfer will not constitute a waiver of any claims that Franchisor may have against the transferring party. Franchisor's consent will not constitute a waiver of Franchisor's right to demand compliance by the transferee with any of the terms of this Agreement, or any other agreement to which Franchisor and the transferee are parties.

## XIII.  DEFAULT AND TERMINATION

      As a matter of policy, Franchisor shall make every good faith effort to avoid terminating this Agreement without having first employed all reasonable steps hereunder to cause Franchisee to correct and cure any default. Furthermore, the terms and conditions regarding default and termination contained herein shall be subject to any applicable state statutes or regulations regarding the termination of a franchise.

      **A.**    **Default With No Opportunity To Cure.** Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately on receipt of notice by Franchisee, on the occurrence of any of the following events:

      1.    If Franchisee becomes insolvent or makes a general assignment for the benefit of creditors, or if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and consented to by Franchisee, or if Franchisee is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee, or if a receiver or other custodian (permanent or temporary) of Franchisee's business or assets is appointed by any court of competent jurisdiction, or if proceedings for a conference with a committee of creditors under any state, federal or foreign law should be instituted by or against Franchisee, or if a final judgment remains unsatisfied or of record for 30 days or longer (unless supersedeas bond is filed), or if execution is levied against Franchisee's operating location or property, or suit to foreclose any lien or mortgage against the premises or equipment is instituted against Franchisee and not dismissed within 30 days, or if any substantial real or personal property of the Franchised Business shall be sold after levy thereon by any sheriff, marshal or constable.

      2.    If Franchisee is convicted of a crime of moral turpitude or similar felony; or is convicted of any other crime or offense that Franchisor reasonably believes is likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated with the Proprietary Marks or Franchisor's interest in the Proprietary Marks; or otherwise engages in behavior that materially impairs the goodwill associated with the Proprietary Marks or Franchisor's rights in the Proprietary Marks; or otherwise willfully misuses or makes any unauthorized use of the Propriety Marks.

FA-Page 25

I have read, understood and agree with the statements on this page as written. Initial Here: R-C  JES

3.     If a judgment or a consent decree against Franchisee, or any of its officers, directors, shareholders or partners is entered in any case or proceeding involving allegations of fraud, racketeering, unfair or improper trade practices or similar claim which is likely to have an adverse effect on the System, or the Proprietary Marks, the goodwill associated therewith or Franchisor's interest therein.

4.     If Franchisee understates its Gross Sales by 5% or more in any report required to be submitted to Franchisor, unless due to an honest mistake.

5.     If Franchisee has made any material misrepresentation or omission in this Agreement or any other agreement to which Franchisee and Franchisor are parties.

6.     If Franchisee (or the principal shareholder, member or partner) engages in the abuse of alcohol and/or illicit drugs while servicing a customer account; or a threat or danger to public safety results from the maintenance or operation of the Franchised Business.

7.     If Franchisee fails to obtain and maintain all required business licenses and permits under state and local law for the jurisdictions in which Franchisee is operating the Franchised Business.

8.     If Franchisee engages in a pattern of failing to obtain the prior written approval of Franchisor of any and all advertising, marketing or promotional plans and materials in whatever form used by Franchisee in connection with its promotion of the Franchised Business or otherwise failing to comply with Franchisor's policies and procedures with respect to advertising, marketing or promotion.

9.     If Franchisee purports to transfer any rights or obligations under this Agreement to any third party without Franchisor's prior written consent, contrary to any of the terms of Section XII of this Agreement.

10.     If Franchisee fails to comply with any of the covenants contained in Section XV of this Agreement.

11.     If, contrary to Sections VII and VIII of this Agreement, Franchisee discloses or divulges the contents of the Manual or any other trade secrets or Confidential Information provided to Franchisee by Franchisor.

12.     If Franchisee knowingly maintains false books or records or submits any false statements, applications or reports to Franchisor or any assignee of Franchisor.

13.     If Franchisee fails to begin operations immediately after being awarded its first customer account.

14.     If Franchisee willfully and repeatedly engages in a course of conduct that constitutes a misrepresentation or a deceptive or unlawful act or practice in connection with its sale of the services offered through the Franchised Business.

15.     If Franchisee, by act or omission, permits a continued violation in connection with the operation of the Franchised Business of any law, ordinance, rule or regulation of a governmental agency, in the absence of a good faith dispute over its application

FA-Page 26

I have read, understood and agree with the statements on this page as written. Initial Here:  R.C.  JFS

or legality and without promptly resorting to an appropriate administrative or judicial forum for relief therefrom.

16.    If Franchisee is providing services to a customer, with or without notifying Franchisor, and directly bills or otherwise collects monies from the customer, or Franchisee otherwise fails to have customer monies paid to the Escrow Account maintained by Franchisor.

17.    If Franchisee services a customer in any capacity other than as a franchise of Franchisor, or engages in any business or markets any service or products under a name or mark which is different from but confusingly similar to the Proprietary Marks; or if Franchisee induces or attempts to induce any customer to cancel or divert a contract for services from Franchisor, and to contract directly with Franchisee outside of the franchise system.

18.    If Franchisee defaults under any other agreement to which Franchisee and Franchisor, or any parent or subsidiary corporation or any other affiliated entity of Franchisor, are parties and fails to cure said default within the grace period (if any) provided for in such agreement; or if any other franchise agreement issued to Franchisee by Franchisor is terminated for any reason.

19.    If Franchisee forfeits the right to do or transact business in the jurisdiction where the Franchised Business is located and the forfeiture remains uncured for 10 days.

20.    If Franchisee's monthly gross billings are less than $100 for three consecutive months.

21.    If Franchisee fails, refuses or neglects to pay promptly any monies owing to its employees in accordance with law, and fails to cure said default within any grace period provided by law or within three days after notice from Franchisor.

22.    If Franchisee receives three or more notices of default under Sections XIII.A or XIII.B during the term of this Agreement, whether or not such defaults are cured after notice.

B.    **Default With 30-Day Opportunity To Cure**. Except as provided in Section XIII.A of this Agreement, Franchisee shall have 30 days after receiving from Franchisor a written notice of default within which to remedy any default described in this Section XIII.B and provide evidence thereof to Franchisor. If any such default is not cured within that time, or such longer period as applicable law may require, this Agreement, at Franchisor's option, shall terminate without further notice to Franchisee effective immediately on the expiration of the 30-day period or such longer period as applicable law may require. Franchisee shall be in default hereunder for any failure to comply substantially with any of the requirements imposed by this Agreement, as it may reasonably be periodically supplemented by updates to the Manual, or for any failure to carry out the terms of this Agreement in good faith. Such defaults shall include, without limitation, the occurrence of any of the following events:

1.    If Franchisee fails, refuses or neglects to pay promptly any monies owing to Franchisor or its subsidiaries or affiliates or suppliers when due;

FA-Page 27

2.     If Franchisee fails to maintain any of the standards or procedures prescribed by Franchisor in this Agreement, the Manual, any other franchise agreement between Franchisor and Franchisee, or any other written agreements between the parties or otherwise;

3.     If Franchisee fails to comply with its duties set forth in Section V of this Agreement or fails to perform any obligation owing to Franchisor or to observe any covenant or agreement made by Franchisee, whether such obligation, covenant or agreement is set forth in this Agreement or in any other agreement with Franchisor including, but not limited to, any other franchise agreement by and between Franchisor and Franchisee or any entity related to Franchisor;

4.     If Franchisee fails to maintain and submit to Franchisor the financial information, monthly statements or any other reports required pursuant to Section IX hereof;

5.     If Franchisee fails to maintain Franchisor's quality control standards with respect to its use of signage and other uses of the Proprietary Marks; or

6.     If Franchisee or its manager fail to attend and successfully complete any mandatory training program unless attendance is excused or waived, in writing, by Franchisor.

C.     **No Right or Remedy.** No right or remedy herein conferred on or reserved to Franchisor is exclusive of any other right or remedy provided or permitted by law or equity.

D.     **Default and Termination.** The events of default and grounds for termination described in this Section XIII shall be in addition to any other grounds for termination contained elsewhere in this Agreement or otherwise.

E.     **Right to Purchase.** If this Agreement is terminated for any reason, including, but not limited to, a default under this Section XIII, Franchisor shall have the right and option to purchase Franchisee's interest in the tangible assets of the Franchised Business.

F.     **Termination or Reassignment of Customer Accounts.** Franchisor may, at its sole discretion, elect to terminate any of Franchisee's customer accounts, elect to service any of Franchisee's customer accounts itself, or elect to reassign any of Franchisee's customer accounts to another franchisee of Franchisor, without notice to Franchisee, on the occurrence of any of the following events:

1.     Franchisee materially fails to perform its obligations to the customer's satisfaction, pursuant to the spirit and intent of Franchisor's System, and such failure continues for five days after written notice from Franchisor to Franchisee;

2.     Franchisor receives written or oral notice from a customer of Franchisee advising that the customer has terminated the account with Franchisee or requesting Franchisor to notify Franchisee of the customer's decision to terminate the account and requesting transfer of the account to another franchisee of Franchisor for any reason;

3.     Franchisee fails to perform its janitorial services or other duties to the customer's satisfaction and a customer makes three oral or written complaints within a 90-day period;

FA-Page 28

CleanNet-IL 0311
I have read, understood and agree with the statements on this page as written. Initial Here: R.C.  J.E.S

4.     Franchisee notifies Franchisor in writing of Franchisee's desire to cease servicing a particular customer;

5.     Franchisee services a customer in any capacity other than as a franchisee of Franchisor; or

6.     Franchisee voluntarily abandons a customer account or abandons the Franchised Business.

If Franchisor exercises its option to terminate or reassign an account under this Section XIII.F, Franchisor will not be required to replace any such account. In addition, Franchisee shall not be entitled to any payments by the customer for any services performed after the termination or reassignment and Franchisee shall not be entitled to any refund, rebate or discount of any fees paid or due to Franchisor because of the termination or reassignment.

## XIV.   OBLIGATIONS ON TERMINATION

On termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and Franchisee shall observe and perform the following:

A.     **Cessation of Operation**. Franchisee shall immediately cease to operate the Franchised Business and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a franchisee of Franchisor.

B.     **Cessation of Use of Proprietary Marks**. Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any equipment, format, confidential methods, customer data base, programs, literature, procedures and techniques associated with the System, the name CLEANNET and any Proprietary Marks and distinctive trade dress, forms, slogans, uniforms, signs, symbols or devices associated with the System. In particular, Franchisee shall cease to use, without limitation, all signs, fixtures, furniture, equipment, advertising materials or promotional displays, uniforms, stationery, forms and any other articles that display the Proprietary Marks associated with the System.

C.     **Cancellation of Name**. Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration that contains the Proprietary Marks or any other trademark, trade name or service mark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within 30 days after termination or expiration of this Agreement.

D.     **Prompt Payment On Default**. Franchisee shall promptly pay all sums owing to Franchisor and its subsidiaries, affiliates and suppliers, including any key return fees. In the event of termination for any default of Franchisee, such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the personal property, machinery, fixtures, equipment and inventory owned by Franchisee and on the premises of the Franchised Business at the time of default.

FA-Page 29

I have read, understood and agree with the statements on this page as written. Initial Here: _R.C_ _JFS_

E.    **Payment of Costs.** Franchisee shall pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor after the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provision of this Section XIV or any other obligation under this Agreement.

F.    **Return of Materials.** Franchisee shall immediately turn over to Franchisor all copies of all materials in Franchisee's possession including the Manual, all records, files, instructions, correspondence, customer database, brochures, agreements, disclosure statements and any and all other materials relating to the operation of the Franchised Business in Franchisee's possession, and all copies thereof (all of which are acknowledged to be Franchisor's property), and shall retain no copy or record of any of the foregoing, excepting only Franchisee's copy of this Agreement, any correspondence between the parties and any other documents which Franchisee reasonably needs for compliance with any provision of law. In addition to the foregoing, Franchisee shall deliver to Franchisor a complete list of all persons employed by Franchisee during the three years immediately preceding termination, together with all employment files of each employee on such list. All costs of delivering all materials required by this Section XIV.I shall be borne by Franchisee.

G.    **Covenant of Further Assurances.** Franchisee will promptly pay all charges due for telephone and Internet services, will cancel or assign to Franchisor or its designee, any Listings used in the Franchised Business. Franchisee shall execute any legal document that may be necessary to effectuate the termination hereunder and shall furnish to Franchisor, within 30 days after the effective date of termination, written evidence satisfactory to Franchisor of Franchisee's compliance with the foregoing obligations.

H.    **Compliance with Covenants.** Franchisee shall comply with all applicable covenants contained in Section XV of this Agreement.

I.    **No Further Interest.** Other than as specifically set forth above, Franchisee shall have no interest in the Franchised Business on termination or expiration of this Agreement.

## XV.   COVENANTS

A.    **Best Efforts.** Franchisee covenants that during the term of this Agreement, and subject to the post-termination provisions contained herein, and except as otherwise approved in writing by Franchisor, Franchisee shall ensure that the manager approved by Franchisor devotes his or her full time, energy and best efforts to the efficient and effective management and operation of the Franchised Business. Franchisee shall provide Franchisor with full information concerning the financial background, employment history and experience of its designated manager at least 30 days before the date on which the designated manager commences employment. Such designated manager shall not commence employment with Franchisee or assume any responsibilities for the operation of the Franchised Business without Franchisor's prior written approval, which approval may not be unreasonably withheld and will be based exclusively on the factors specified herein. Should Franchisor not approve Franchisee's recommended designated manager, Franchisee shall recommend another individual as designated manager, and the designated manager must be approved as set forth herein.

FA-Page 30

**B.     Ethical Practices.** Franchisee has heretofore specifically acknowledged that pursuant to this Agreement, Franchisee shall receive valuable specialized training and confidential and other information regarding the business, promotional, sales, marketing and operational methods and techniques of Franchisor and the System. Franchisee covenants that during the term of this Agreement and continuing for two years after expiration, non-renewal or termination for any reason, Franchisee shall not, except as otherwise approved in writing by Franchisor, either directly or indirectly, for itself or through, on behalf of or in conjunction with any person, persons, partners or entities:

1.     Divert or attempt to divert any business or customer of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the System;

2.     Employ or seek to employ any person who is at that time employed by Franchisor or by any other Franchisee or Area Developer of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment;

3.     Own, maintain, engage in, be employed by, advise, assist, invest in, franchise, make loans to or have any interest in any business which is the same as or substantially similar to the Franchised Business and which is located or operates within the Designated Territory; or

4.     Solicit business from customers doing business directly with Franchisor, or with any other CleanNet franchisee, or otherwise interfere with the ongoing direct service provided by Franchisor or a franchisee.

**C.     Severability.** If the period of time or the area specified above, should be adjudged unreasonable in any proceeding, then the period of time will be reduced by such number of months or the area will be reduced by the elimination of such portion thereof, or both, so that such restrictions may be enforced in such area and for such time as is adjudged to be reasonable. Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

**D.     No Undue Hardship.** Franchisee acknowledges and agrees that the covenants set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Franchisee, or Franchisee's shareholders, members or partners, if Franchisee is a legal entity, since Franchisee, its shareholders, members or partners have other considerable skills, experience and education which afford Franchisee, its shareholders, members or partners the opportunity to derive income from other endeavors.

FA-Page 31

## XVI.   CHANGES AND MODIFICATIONS

Franchisor may modify this Agreement only on the execution of a written agreement by Franchisor and Franchisee. Franchisor reserves and shall have the sole right to make changes in the Manual, the System and the Proprietary Marks at any time and without prior notice to Franchisee. Franchisee shall promptly alter any signs, products, business materials or related items, at its sole cost and expense, on written receipt of written notice of such change or modification in order to conform to Franchisor's revised specifications. In the event that any improvement or addition to the Manual, the System or the Proprietary Marks is developed by Franchisee, then Franchisee agrees to grant to Franchisor an irrevocable, world-wide, exclusive, royalty-free license, with the right to sublicense such improvement or addition.

Franchisee understands and agrees that due to changes in competitive circumstances, presently unforeseen changes in the needs of customers, and/or presently unforeseen technological innovations, Franchisor's System must not remain static, in order that it best serve the interests of Franchisor, franchisees and the System. Accordingly, Franchisee expressly understands and agrees that Franchisor may periodically change the components of the System, including but not limited to, altering the programs, services, methods, standards, forms, policies and procedures of that System; adding to, deleting from or modifying those programs, products and services which the Franchised Business is authorized to offer; and changing, improving or modifying the Proprietary Marks. Subject to the other provisions of this Agreement, Franchisee expressly agrees to abide by any such modifications, changes, additions, deletions and alterations.

## XVII.   TAXES AND INDEBTEDNESS

**A.**      **Payment.** Franchisee shall promptly pay, when due, all taxes levied or assessed by any federal, state or local tax authority and any and all other indebtedness incurred by Franchisee in the operation of the Franchised Business. Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax or similar tax imposed on Franchisor or Franchisee with respect to any payments to Franchisor or Franchisee required under this Agreement or under an agreement with a customer, unless the tax is credited against income tax otherwise payable by Franchisor.

**B.**      **Dispute.** In the event of any bona fide dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; provided, however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchised Business or any improvements thereon.

**C.**      **Compliance with Federal, State and Local Laws.** Franchisee shall comply with all federal, state, and local laws, rules and regulations, and shall timely obtain any and all permits, certificates, licenses and bonds necessary for the full and proper operation and management of the Franchised Business, including, without limitation, a license to do business and provide services, fictitious name registration and sales tax permits. Copies of all subsequent

CleanNet-IL 0311
I have read, understood and agree with the statements on this page as written. Initial Here:    *RC*    *JES*

inspection reports, warnings, certificates and ratings, issued by any governmental entity during the term of this Agreement in connection with the conduct of the Franchised Business which indicate Franchisee's failure to meet or maintain the highest governmental standards or less than full compliance by Franchisee with any applicable law, rule or regulation, shall be forwarded to Franchisor by Franchisee within three days of Franchisee's receipt thereof.

       **D.**    **Duty to Notify.** Franchisee shall notify Franchisor in writing within three days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation or financial condition of the Franchised Business. Additionally, any and all consumer or customer related complaints shall be answered by Franchisee within 15 days after receipt thereof or such shorter period of time as may be provided in said complaint. A copy of said answer shall be forwarded to Franchisor within three days of the date that said answer is forwarded to the complainant.

## XVIII.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION

       **A.**    **Independent Contractor.** During the term of this Agreement and any extensions hereof:

       1.    Franchisee shall hold itself out to the public as an independent contractor operating the Franchised Business pursuant to a license from Franchisor and as an authorized user of the System and the Proprietary Marks that are owned by Franchisor. Franchisee acknowledges and agrees that this Agreement creates an arm's-length business relationship; that it does not create any fiduciary, special or other similar relationship; that Franchisee is and shall remain at all times a completely independent contractor, and that nothing in this Agreement is intended to make either party an agent, legal representative, subsidiary, joint venturer, partner, employee or servant of the other for any purpose whatsoever. Franchisee and its agents and employees may not be considered or held out to be Franchisor's agents or employees. Except as provided by Section III.B.2, Franchisor does not control or have access to Franchisee's funds or expenditures, or exercise dominion or control over the Franchised Business in any other way.

       2.    Franchisee shall exercise complete control over and responsibility for all labor relations and the conduct of its agents and employees, including the day-to-day operations of the Franchised Business and all of Franchisee's employees. Franchisee shall be responsible for all applicable self-employment taxes and income taxes and assumes full responsibility for social security and other taxes required to be withheld and for worker's compensation for all its employees. Franchisor shall not have the power to hire, supervise, discipline or fire Franchisee's employees and does not exercise any discretion or control over Franchisee's employment policies or employment decisions. All employees of the Franchised Business are solely Franchisee's employees and Franchisee will retain exclusive control over the manner and means of the operations of the Franchised Business and its employees.

       **B.**    **No Liability.** It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and that Franchisor shall in no event assume liability for or be deemed liable hereunder as a result of any

FA-Page 33

I have read, understood and agree with the statements on this page as written. Initial Here:    _R C_    _JFS_

such action or by reason of any act or omission of Franchisee in Franchisee's conduct of the Franchised Business or any claim or judgment arising therefrom against Franchisor. Franchisee agrees to control the manner and means of the operation of the Franchised Business. Franchisee agrees to abide by all federal, state and local laws and ordinances of all government agencies or political subdivisions thereof having jurisdiction over each customer's premises or the activities conducted by Franchisee.

      C.    **No False Representations**. Except as otherwise expressly authorized by this Agreement, neither party hereto will make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name of or on behalf of the other party, or represent that the relationship between Franchisor and Franchisee is other than that of Franchisor and Franchisee. Franchisor does not assume any liability, and will not be deemed liable, for any agreements, representations, or warranties made by Franchisee that are not expressly authorized under this Agreement, nor will Franchisor be obligated for any damages to any person or property which directly or indirectly arise from or relate to the operation of the Franchised Business franchised hereby. Franchisee and its agents and employees may not negotiate or enter any agreement or incur any liability in Franchisor's name, on Franchisor's behalf, or purporting to bind Franchisor. No actions that Franchisee, its agents or employees take will be attributable to Franchisor or be considered actions obligating Franchisor. Franchisee shall never state or imply that it is a division or subsidiary of Franchisor or that it has the legal right or power to bind Franchisor in a contractual relationship.

      D.    **Identification**. Franchisee shall at all times conspicuously identify itself and the Franchised Business and in all dealings with its clients, contractors, suppliers, public officials and others, as an independently owned and operated franchisee of Franchisor. Franchisee shall place such notice of independent ownership on all forms, business cards, stationery, advertising, signs and other materials, with such content and in such fashion as Franchisor may, in its sole and exclusive discretion, periodically specify and require in its Manual (as same may be periodically amended) or otherwise in writing.

      E.    **Indemnification**. Franchisee agrees at all times to defend at his own cost, and to indemnify and hold harmless to the fullest extent permitted by law, Franchisor, its corporate parent, the corporate subsidiaries, affiliates, successors, assigns and designees of either entity, and the respective directors, officers, employees, agents, shareholders, designees, and representatives of each (Franchisor and all other hereinafter referred to collectively as "Indemnities") from all losses and expenses incurred in connection with any action, suit, proceeding, claim, demand, investigation, or formal or informal inquiry (regardless of whether same is reduced to judgment) or any settlement thereof which arises out of or is based on any of the following: Franchisee's alleged infringement or any other violation or any other alleged violation of any patent, trademark or copyright or other proprietary right owned or controlled by third parties; Franchisee's alleged violation or breach of any contract, federal, state or local law, regulation, ruling, standard or directive of any industry standard; libel, slander or any other form of defamation by Franchisee; Franchisee's alleged violation or breach of any warranty, representation, agreement or obligation in this Agreement; any acts, errors or omissions of Franchisee or any of its agents, servants, employees, contractors, partners, proprietors, affiliates, or representatives; latent or other defects in the Franchised Business, whether or not discoverable by Franchisor or Franchisee; the inaccuracy, lack of authenticity or nondisclosure of any

FA-Page 34

I have read, understood and agree with the statements on this page as written, Initial Here:    _R C_    _JFS_

information by any customer of the Franchised Business; any services or products provided by Franchisee at, from or related to the operation at the Franchised Business; any services or products provided by any affiliated or nonaffiliated participating entity; any action by any customer of the Franchised Business; and, any damage to the property of Franchisee or Franchisor, their agents or employees, or any third person, firm or corporation, whether or not such losses, claims, costs, expenses, damages, or liabilities were actually or allegedly caused wholly or in part through the active or passive negligence of Franchisor or any of its agents or employees, or resulted from any strict liability imposed on Franchisor or any of its agents or employees.

## XIX.  APPROVALS AND WAIVERS

A.    **Written Consent.** Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefore and such approval or consent shall be obtained in writing.

B.    **No Waiver.** No failure of Franchisor to exercise any power reserved to it by this Agreement, or to insist on strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms herein. Waiver by Franchisor of any particular default by Franchisee shall not affect or impair Franchisor's rights with respect to any subsequent default of the same, similar or different nature, nor shall any delay, forbearance or omission of Franchisor to exercise any power or right arising out of any breach or default by Franchisee of any of the terms, provisions or covenants hereof affect or impair Franchisor's right to exercise the same, nor shall such constitute a waiver by Franchisor of any right hereunder or the right to declare any subsequent breach or default and to terminate this Franchise before the expiration of its term. Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed a waiver by Franchisor of any preceding breach by Franchisee of any terms, covenants or conditions of this Agreement.

## XX.   RELEASE OF PRIOR CLAIMS

By executing this Agreement, Franchisee, individually and on behalf of Franchisee's heirs, legal representatives, successors and assigns, and each assignee of this Agreement by accepting assignment of the same, hereby forever releases and discharges Franchisor and its officers, directors, employees, agents and servants, including Franchisor's subsidiary and affiliated corporations, their respective officers, directors, employees, agents and servants, from any and all claims relating to or arising under any franchise agreement or any other agreement between the parties executed before the date of this Agreement including, but not limited to, any and all claims, whether presently known or unknown, suspected or unsuspected, arising under the franchise, securities or antitrust laws of the United States or of any state or territory thereof.

R C JFS Please initial to acknowledge that you have read and understand this Section XX.

## XXI.  DISCLOSURE STATEMENT AND DISCLAIMER

A.    **Compliance with Applicable Franchise Laws.** Franchisee acknowledges, by its signature hereto, that it received from Franchisor a disclosure document for the state in which the Franchised Business will be located, and\or Franchisee's place of residence, as appropriate, at

FA-Page 35

I have read, understood and agree with the statements on this page as written. Initial Here:    RC    JFS

least fourteen (14) calendar days before the execution of this Agreement or making any payment to Franchisor.

  **B.**  <u>Receipt of Agreement</u>. Franchisee acknowledges that Franchisor has informed Franchisee of the differences between this Agreement and Franchisor's standard franchise agreement (including, for example, Franchise Package Designation and Initial Franchise Fee) at least seven (7) calendar days before Franchisee signed this Agreement. Franchisee has received a substantially complete version of this Agreement and all attachments at least seven (7) calendar days before signing this Agreement. Franchisee represents that it has read this Agreement in its entirety and that it has been given the opportunity to clarify any provisions that it did not understand and to consult with an attorney or other professional advisor. Franchisee further represents that it understands the terms, conditions and obligations of this Agreement and agrees to be bound thereby.

  **C.**  <u>Review of Disclosure Document and Franchise Agreement</u>. Franchisee represents that it has read this Agreement and Franchisor's disclosure document in their entirety and that it has been given the opportunity to clarify any provisions that it did not understand and to consult with an attorney or other professional advisor. Franchisee further represents that it understands the terms, conditions and obligations of this Agreement and agrees to be bound thereby.

  **D.**  <u>English Language</u>. Franchisee acknowledges that Franchisor's disclosure document and this Agreement are written in the English language. If English is not Franchisee's native language, Franchisee warrants and represents that Franchisee has had the opportunity for translation of the disclosure document and this Agreement; that all aspects of this Agreement have been explained to Franchisee's satisfaction; and that Franchisee understands and accepts this Agreement as written. Franchisee warrants and represents that Franchisee can in fact conduct business in the English language and that conducting business in the English language does not constitute an undue burden on Franchisee.

  **E.**  <u>Acknowledgment</u>. Franchisee acknowledges and accepts the following:

  1.  THIS OFFERING IS NOT A SECURITY AS THAT TERM IS DEFINED UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS.

  2.  FRANCHISEE'S SUCCESS IN OWNING AND OPERATING A FRANCHISE IS SPECULATIVE AND WILL DEPEND ON MANY FACTS INCLUDING THE HOURS WORKED AND FRANCHISEE'S GROSS BILLINGS.

  3.  THE OBLIGATION TO TRAIN, MANAGE, PAY, RECRUIT AND SUPERVISE EMPLOYEES OF THE FRANCHISED BUSINESS RESTS SOLELY WITH FRANCHISEE.

  4.  FRANCHISOR HAS NOT MADE ANY REPRESENTATION, WARRANTY OR GUARANTY, EXPRESS OR IMPLIED, AS TO THE POTENTIAL REVENUES, PROFITS OR SERVICES OF THE BUSINESS VENTURE TO FRANCHISEE AND CANNOT, EXCEPT UNDER THE TERMS OF THIS AGREEMENT, EXERCISE CONTROL OVER FRANCHISEE'S BUSINESS.

FA-Page 36

5. NO REPRESENTATIONS OR PROMISES HAVE BEEN MADE BY FRANCHISOR TO INDUCE FRANCHISEE TO ENTER INTO THIS AGREEMENT EXCEPT AS SPECIFICALLY INCLUDED IN THIS AGREEMENT, ANY RELATED AGREEMENTS, AND ANY ATTACHMENTS, OR THE REPRESENTATIONS IN FRANCHISOR'S DISCLOSURE DOCUMENT (INCLUDING ITS EXHIBITS AND ANY QUARTERLY UPDATES OR AMENDMENTS) THAT WAS PROVIDED TO FRANCHISEE BY FRANCHISOR.

6. FRANCHISEE HAS NOT RELIED ON ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, AS TO THE POTENTIAL SUCCESS OR PROJECTED INCOME OF THE BUSINESS VENTURE CONTEMPLATED HEREBY, EXCEPT ANY FINANCIAL PERFORMANCE REPRESENTATIONS CONTAINED IN ITEM 19 OF FRANCHISOR'S DISCLOSURE DOCUMENT.

7. FRANCHISEE ACKNOWLEDGES AND AGREES THAT IT HAS NO KNOWLEDGE OF ANY REPRESENTATION MADE BY FRANCHISOR OR ITS REPRESENTATIVES OF ANY INFORMATION THAT IS CONTRARY TO, OR SUPPLEMENTAL TO, THE TERMS CONTAINED IN THIS AGREEMENT.

8. FRANCHISEE HAS REPRESENTED TO FRANCHISOR THAT NEITHER FRANCHISEE NOR ANY OF ITS OWNERS HAVE BEEN DESIGNATED AS SUSPECTED TERRORISTS AS SET FORTH ON THE LIST OF SPECIALLY DESIGNATED NATIONALS AS PROMULGATED BY THE OFFICE FOR ASSET CONTROL UNDER THE U.S. DEPARTMENT OF TREASURY.

R.C JES **Please initial to acknowledge that you have read and understand this Section XXI**

## XXII. DISPUTE RESOLUTION

The parties to this Agreement recognize that compliance with the terms of this Agreement and the nature of the Franchisor/Franchisee relationship may give rise to the need to resolve disputes between the parties. Both Franchisee and Franchisor wish to avoid the time, expense and disruption that can result from lawsuits, but they desire to have a method of resolving disputes that is mutually acceptable. For this purpose, the parties expressly agree first to resolve disputes by direct negotiation with each other. If such negotiations fail to reach an agreement, the party dissatisfied with the outcome of negotiations must submit the dispute, within 180 days, to mediation and/or arbitration under this Section XXII, as follows:

A. **Mediation.** Before, and as a necessary condition precedent to, filing a demand for arbitration in accordance with this Agreement, Franchisee and Franchisor shall attempt to settle the dispute through mediation administered by the American Arbitration Association ("AAA") at its office closest in proximity to Franchisor's office in accordance with the Commercial Mediation Rules of the AAA. The filing fee for the proceeding shall be borne by the initiating party. The mediator's compensation and any administrative costs shall be borne equally by both parties. If Franchisee and Franchisor arrive at an agreement through mediation, then that agreement shall be set forth in writing and be binding upon both parties.

B. **Arbitration.** All disputes, controversies, and claims of any kind arising between the parties, including but not limited to claims arising out of or relating to this Agreement, the

FA-Page 37

I have read, understood and agree with the statements on this page as written. Initial Here: R.C JES 

rights and obligations of the parties, the sale of the franchise, or other claims or causes of action relating to the performance of either party that are unable to be settled through mediation shall be settled by arbitration administered by the AAA at its office closest in proximity to the Franchisor's office, in accordance with the Federal Arbitration Act and the Commercial Rules of the AAA, unless the parties otherwise agree in accordance with Section XXII.C of this Agreement.

    1. This Section XXII.B shall survive expiration, non-renewal or termination of this Agreement for any reason.

    2. The filing fee for the proceeding shall be borne by the initiating party. The arbitrator's compensation and any administrative costs shall be borne equally by both parties.

    3. Either party shall have the right to seek a court order granting injunctive relief where such relief is necessary in order to provide protection on a temporary or preliminary basis while the arbitration process is pursued.

    4. The parties expressly agree that an arbitrator shall have the power to enter an award, including injunctive relief, protecting each party's rights to the same extent a court could do so, and such relief shall be enforceable by a court having jurisdiction under Section XXII.E of this Agreement.

    5. No arbitration or action under this Agreement shall include, by consolidation, joinder, or any other manner, any claims by any person or entity in privity with or claiming through or on behalf of Franchisee. Franchisee shall not seek to arbitrate or litigate as a representative of, or on behalf of, any other person or entity, any dispute, controversy, and claim of any kind arising out of or relating to this Agreement, the rights and obligations of the parties, the sale of the franchise, or other claims or causes of action relating to the performance of either party to this Agreement.

    6. To the fullest extent permitted by law, direct negotiation, followed by mediation and/or binding arbitration, shall be the exclusive means of resolving any and all claims relating to this Agreement, including, but not limited to, claims of breach of contract, breach of the covenant of good faith and fair dealing, fraud, violation of any and all franchise registration, disclosure and/or franchisee protection statutes, regulations, or ordinances, whether federal, state or local, or any other common laws claims.

    C. **Alternative Procedures**. The parties understand that specific disputes may make some flexibility in the foregoing dispute resolution procedures desirable. The parties may modify any of the negotiation, mediation or arbitration procedures as described below, or in any other manner that is mutually agreed:

    1. **Dispute Resolution Procedural Rules.** Either party may propose to use a dispute resolution organization other than the AAA, if the proposed organization has rules governing proceedings that are comparable in scope and formality to the AAA Commercial Rules. Under no circumstances shall either of the parties seek to proceed under the AAA Employment Arbitration Rules. The parties may also agree to use a private mediator or arbitrator who would then operate in accordance with the AAA Commercial Rules or a comparable set of rules.

FA-Page 38

I have read, understood and agree with the statements on this page as written. Initial Here: RC JES 

2.     **Alternate Venue.** Franchisor's office is typically in an urban area where mediators and arbitrators are available. However, if Franchisee's office is more than 75 miles from Franchisor's office and a reasonable number of experienced mediators and arbitrators are available in Franchisee's location, the parties may agree to conduct the proceedings in Franchisee's location.

3.     **Cost Minimization.** If the dispute is a small one, such that the anticipated costs of the dispute resolution (i.e., filing fees and mediator or arbitrator fees, but not party time or attorney's fees) would exceed the amount of the dispute, the parties may seek to resolve the dispute through a local dispute resolution office, including any such office within a local court, which may provide its services at no cost or a nominal cost.

4.     **Consolidation of Claims.** Where one or more other franchisees of Franchisor have a dispute that is so nearly identical to a dispute involving Franchisee that Franchisor, Franchisee, and the other franchisee or franchisees agree that it would be prudent to have all of the disputes resolved in a single mediation or arbitration proceeding, Franchisor, Franchisee, and the other franchisee or franchisees may agree in writing to submit the consolidated disputes to mediation and/or arbitration for determination by an arbitrator using the terms of this Article XXII. Such agreement shall only apply to Franchisee and any franchisees directly involved in the consolidated proceedings, and, under no circumstances, shall the arbitrator have the power to determine the legal rights or obligations of any person or party not directly participating in the proceedings.

**D.     Governing Law.** This Agreement, amendments and addenda thereto, and the interpretation and enforcement thereof, and compliance therewith, shall be governed by the internal domestic laws of ILLINOIS, exclusive of any rules regarding conflict of laws. This agreement has been negotiated and entered into in ILLINOIS, and calls for performance, in whole or in part, by both of the parties within ILLINOIS.

**E.     Jurisdiction and Venue.** The parties agree that any arbitration or legal action commenced in connection with this Agreement shall be brought, and jurisdiction and venue shall be proper only, in DUPAGE COUNTY, ILLINOIS in which Franchisor has its principal place of business, or to the United States District Court within whose jurisdiction DUPAGE COUNTY, ILLINOIS lies, and the parties waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision. This provision contemplates that the parties may proceed in court where an arbitrator does not have jurisdiction, a claim can not be arbitrated as a matter of law, or where there is an action to enforce an arbitral award or an appeal from or relating to arbitration, and does not affect the applicability of Section XXII.B, which requires the parties to submit all claims to binding arbitration. This provision further applies where a party seeks a temporary restraining order or a preliminary injunction ancillary to arbitration proceedings as described in Section XXII.B of this Agreement.

**F.     Saving Clause.** If any provision of this Section XXII would violate applicable state or federal law, then the parties agree that such provision shall be excluded from the terms of this Agreement, or shall be modified to the minimum extent necessary to make the terms hereof lawful.

I have read, understood and agree with the statements on this page as written. Initial Here: R.C    JES

     **G.**    <u>Waiver of Punitive Damages.</u> FRANCHISEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT OR CLAIM FOR ANY PUNITIVE, EXEMPLARY, CONSEQUENTIAL, OR SPECULATIVE DAMAGES INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, AND AGREES THAT, IN THE EVENT OF A DISPUTE, FRANCHISEE SHALL BE LIMITED TO THE ACTUAL DAMAGES SUSTAINED EXCEPT AS OTHERWISE PROVIDED HEREIN.

     **H.**    <u>Waiver of Jury Trial.</u> FRANCHISOR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY OF ANY DISPUTE THAT MAY BE BROUGHT IN COURT, REGARDLESS OF WHICH PARTY COMMENCED THE PROCEEDING. NOTHING IN THIS WAIVER IS INTENDED TO IMPLY THAT A DISPUTE IS NOT A PROPER SUBJECT OF MEDIATION AND ARBITRATION.

**XXIII.**    <u>NOTICES</u>

     Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or mailed by certified mail, return receipt requested, or sent by overnight delivery with confirmation of delivery. Any notice sent by certified mail shall be deemed to have been given at the date and time of mailing. Notices to the respective parties shall be sent to the following addresses unless and until a different address has been designated by notice to the other party:

Notices to Franchisor:          CleanNet of Illinois, Inc.
                               Attention:  Mr. Daniel Falese
                               Oak Brook Executive Plaza, Suite 302
                               1301 West 22nd Street
                               Oak Brook, IL 60523

Notices to Franchisee: *Ricardo Cruz*         *Jose F. Sanchez*
                       *711 Linden Ct.*          *711 Linden Ct.*
                       *Bolingbrook, IL 60440*    *Bolingbrook, IL 60440*

**XXIV.**    <u>ADMINISTRATIVE PROVISIONS</u>

     **A.**    <u>Severability.</u> Except as expressly provided to the contrary herein, each section, part, term and/or provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect on, such other portions, sections, parts, terms and/or provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto, and said invalid sections, parts, terms and/or provisions shall be deemed not to be a part of this Agreement; provided, however, that if Franchisor determines that such finding of invalidity or illegality adversely affects the basic consideration of this Agreement, Franchisor, at its option, may terminate this Agreement.

I have read, understood and agree with the statements on this page as written. Initial Here: *R.C*    *JES*

B.    **Captions.** All captions in this Agreement are intended solely for the convenience of the parties, and none of the captions shall be deemed to affect the meaning or construction of any provision hereof.

C.    **References.** All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, where applicable, and all acknowledgments, promises, covenants, agreements and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all of the parties executing this Agreement in his individual capacity on behalf of Franchisee. This Agreement may be executed in one or more originals, each of which shall be deemed an original.

D.    **Definition of Franchisee.** As used in this Agreement, the term "Franchisee" shall include all persons who succeed to the interest of the original Franchisee by transfer or operation of law and shall be deemed to include not only the individual or entity defined as the "Franchisee" in the introductory paragraph of this Agreement, but shall also include all partners, members, shareholders, officers and directors of the entity that executes this Agreement. By their signatures hereto, all partners, members, shareholders, officers and directors of the entity that signs this Agreement as Franchisee acknowledge and accept the duties and obligations imposed on each of them, individually, by the terms of this Agreement.

E.    **Force Majeure.** If, as a result of avalanche, blizzard, earthquake, explosion, fire, flood, hurricane, insurrection, lightning, riot, tornado, typhoon, volcanic eruption, war, other unusually severe weather, unavoidable calamity or other act of God ("Force Majeure"), compliance by any party with the terms of this Agreement is rendered impossible or would otherwise create an undue hardship on any party, all parties shall be excused from their respective obligations hereunder for the duration of the event of Force Majeure and for a reasonable recovery period thereafter, but otherwise this Agreement shall continue in full force and effect.

## XXV.    ENTIRE AGREEMENT

This Agreement, the documents referred to herein and the Attachments hereto, if any, constitute the entire, full and complete Agreement between the parties hereto concerning the subject matter hereof, and supersede all prior written or oral representations or agreements with no other representations having induced Franchisee, except the representations made to Franchisee in Franchisor's Franchise Disclosure Document (including its exhibits and any updates or amendments). No amendment, change or variance from this Agreement shall be binding on the parties hereto unless mutually agreed to by the parties and executed by themselves or their authorized officers or agents in writing.

I have read, understood and agree with the statements on this page as written. Initial Here: R·C   JES

**IN WITNESS WHEREOF,** the parties hereto have duly executed, sealed and delivered this Agreement on the day and year first above written.

**FRANCHISOR:**

CLEANNET OF ILLINOIS, INC.

By: _____

Printed Name: _Daniel Falese_

Title: _Regional Director_

**FRANCHISEE:**

By: _Ricardo Cruz_

Printed Name: _Ricardo Cruz_

Title, if any: _____

**PARTNER:**

By: _Jose F Sanchez_

Printed Name: _Jose F Sanchez_

Title, if any: _____

FA-Page 42

I have read, understood and agree with the statements on this page as written. Initial Here: _R.C  JFS_

## ATTACHMENT G

### CONFIDENTIALITY AGREEMENT

In consideration for the opportunity to view the confidential operations manuals of CleanNet ("we," "us" or "our"), Ricardo Cruz, Jose F. Sanchez ("you") hereby agree as follows:

1. <u>Definition of Confidential Information</u>. Confidential Information means our contracts, forms, methods, knowledge, trade secrets, proprietary, confidential or competitively sensitive information, including but not limited to our Manuals, standards and specifications, business plans, marketing methods, databases, market research, as well as financial reports and other franchisee information, and such other information as we may identify and treat as confidential.

2. <u>Exclusions</u>. Confidential Information does not include and this Agreement does not apply to information that is (a) previously known to you; (b) independently developed by you; (c) part of the public domain, other than through your wrongful act; or (d) otherwise in your hands of by a means other than breach of this Agreement.

3. <u>Non-Disclosure</u>. You will not, directly or indirectly, disclose or otherwise reveal the Confidential Information to any person or entity except those persons who are employed by us, and authorized to receive such Confidential Information.

4. <u>Non-Use</u>. You will not, directly or indirectly, use the Confidential Information for your benefit, or for the benefit of any 3rd party, or in any other manner except as we authorize.

5. <u>Return of Confidential Information</u>. You agree that you will promptly return to us all documents or other tangible property that contain the Confidential Information in your possession or under your control on our request, and you will not retain any copies, extracts or other reproductions (whether paper, electronic or some other form) of such Confidential Information, in whole or in part. Notwithstanding the return of the Confidential Information, you acknowledge and agree that you will continue to be bound by your obligations hereunder.

6. <u>No Waiver</u>. No failure or delay by us in exercising any right, power or privilege hereunder will operate as a waiver thereof by us, nor will any single or partial exercise thereof preclude our other or future exercise thereof or our exercise of any other right, power or privilege hereunder.

7. <u>Severability</u>. Each term and condition of this Agreement will be considered severable. If any provision of this Agreement is determined to be invalid or unenforceable in whole or in part, that determination will not affect the validity or enforceability of any other provision of this Agreement.

8. <u>Assignment</u>. We may assign our rights under this Agreement, and this Agreement shall inure to the benefit of our successors and assigns. You may not assign your rights and obligations under this Agreement.

1

9.     <u>Applicable Law</u>. This Agreement will be governed by, interpreted by, controlled by, enforced and construed in accordance with the laws of **ILLINOIS**.

10.     <u>Jurisdiction & Venue</u>. In the event of a dispute arising out of this Agreement, any litigation brought by either party will be instituted and take place in an appropriate court having venue in **DUPAGE COUNTY, ILLINOIS**, and you and we consent to the jurisdiction and venue of such courts.

11.     <u>Equitable Relief</u>. You acknowledge and agree that money damages would not be a sufficient remedy for your breach of this Agreement, and that we will be entitled to an injunction as a remedy for any actual or threatened breach of this Agreement. Such remedy will not be deemed the exclusive remedy for your breach of this Agreement, but will be in addition to all other remedies available at law or equity. Nothing herein will be construed as prohibiting us from pursuing any other available remedies, including the recovery of damages from you.

12.     <u>Legal Fees & Costs</u>. If you breach this Agreement, you will pay our reasonable attorney's fees and other costs incurred in enforcing or commencing to enforce the provisions of this Agreement. If any legal proceeding is commenced to enforce or interpret any provisions of this Agreement, the prevailing party will be entitled to recover reasonable attorney's fees in addition to costs and disbursements allowed by law.

13.     <u>Entire Agreement</u>. This Agreement sets forth and constitutes the entire understanding of the parties related to Confidential Information and supersedes any and all other agreements, either oral or written as to the subject matter. This Agreement cannot be changed or revoked except by written agreement signed by you and us.

*Ricardo Cruz / Jose F. Sanchez*

Printed Name: Jose F. Sanchez

Address: 711 Linden Ct

Bolingbrook IL 60440

Date: 5/19/2001